THE GUIDING STAR.

BENNITT v. THE GUIDING STAR.

(District Court, S. D. Ohio, W. D.    January 27, 1893.)

No. 1,697.

1. CARRIERS OF GOODS—LIABILITY FOR LOSS—DEFENSES—ADVANCES BY INSURER
   TO SHIPPER.
       Certain fully insured cotton having been destroyed, as claimed, through
   the negligence of a carrier, the insurer advanced the value thereof
   to the owner as a loan without interest, with the understanding that the
   latter should sue the carrier, and, if successful, repay the loan, and, if
   unsuccessful, retain the money as payment of the insurance. *Held*, that
   this arrangement was no bar to a libel by the owner against the carrier.

2. SAME—BILL OF LADING.
       The owners of certain Mississippi steamboats formed an association,
   and appointed a common agent, with authority to sign bills of lading, un-
   der an arrangement by which the bills were frequently signed on delivery
   of the goods at the landing, and the goods were to be taken by the first
   boat of the association which passed. The name of the particular boat
   was usually entered in the bill when the goods were received on board.
   *Held* that, where goods were destroyed at the landing after the bills of
   lading were signed, the fact that no particular boat was mentioned therein

would not prevent the maintenance of a libel against the next boat which passed the landing, and upon which the goods would have been shipped.

**3. SAME— AUTHORITY OF AGENT.**

The common agent of the boats, being a general freight agent, had power to authorize others to sign bills of lading in his name, and bills so signed were binding upon the principal.

**4. SAME—DELIVERY OF GOODS.**

Where a person thus authorized by the agent to sign a bill of lading was also owner of a cotton yard in which cotton designed for shipment was stored, the transfer of the cotton by him from the cotton yard to the steamboat landing, and a signing by him of the bill of lading, was a valid delivery of the cotton.

**5. SHIPPING—BILL OF LADING—ESTOPPEL—WAIVER.**

On a libel by a shipper to recover for goods alleged to have been destroyed while in possession of a boat for transportation, it was claimed that the boat was estopped by a bill of lading from denying actual receipt of the goods under Act Miss. March 16, 1886, providing that bills of lading shall be conclusive evidence in the hands of bona fide holders that the goods were actually received for transportation. But libelant himself introduced evidence that the goods were destroyed by fire at the steamboat landing, and were never received on board, and that such destruction was due to the negligence of the steamboat's agents. *Held*, that this evidence must be considered as in the case for all purposes, and that by introducing it libelant had to that extent waived the estoppel of the statute, and had opened the door to the introduction of evidence on these points by the libelee.

**6. SAME—LIEN—LOSS AT LANDING.**

There is no lien upon a vessel in respect to goods for which her agents have issued a bill of lading, but which are destroyed while in custody of the keeper of the landing before being received on board or coming under the control of the master.

**7. SAME—NEGLIGENCE—FIRE.**

Where cotton alleged to be in charge of a carrier's agents is destroyed by fire while lying uncovered and unprotected at a lonely country landing awaiting shipment by a steamboat, there being no evidence as to how the fire originated, the fact that no appliances for extinguishing fire were at hand, and that no watch was maintained, will not justify the inference of negligence, since, under such circumstances, no danger from fire could reasonably be apprehended.

In Admiralty. Libel by Henry T. Bennitt against the steamer Guiding Star to enforce a claim for cotton alleged to have been destroyed while in possession of the steamer's agents. Libel dismissed.

Statement by SAGE, District Judge:

The libel in this case is to enforce the libelant's claim against the steamer Guiding Star for $17,351.94, the alleged value of 238 bales of raw cotton, received by said steamer in good order and condition from W. P. McBath & Co., doing business in the state of Mississippi, who had bought the same by order and for the account of the libelant. It is averred that 100 bales of said cotton were delivered to said steamer on the 15th day of January, 1890, and 138 bales on the 22d of January, 1890, all to be transported without delay, in like order, to the port of Cincinnati, Ohio, unavoidable dangers of the river, collision, explosion, and fire excepted; and that said steamer then and there issued and delivered to said McBath & Co., who thereafter indorsed their name in blank thereon, two bills of lading for said cotton, signed by the duly-authorized agent of said steamer and its owner, associated with others in the business of transportation under the name of the Southern Transportation Company, and that said bills of lading so indorsed were transmitted to the libelant, who is the owner and holder thereof.

The libel further sets forth that by a statute of the state of Mississippi entitled "An act to define the liability of persons and corporations issuing bills

of lading and warehouse receipts," dated March 16, 1886, it is enacted as follows:

"Section 1. That every bill of lading or instrument in the nature or stead thereof, acknowledging the receipt of cotton or other things, shall be conclusive evidence in the hands of every bona fide holder, whether by assignment, pledge, or otherwise, as against the person or corporation issuing the same, that the cotton or other things have been actually received for transportation.

"Sec. 2. That the receipt of a warehouseman, or instrument in the nature or stead thereof, shall be conclusive evidence in the hands of every bona fide holder, whether by assignment, pledge, or otherwise, as against the person or corporation issuing the same, that the cotton or other things mentioned in the receipt have been actually received for storage."

The libel further avers that the force and effect of said act, as defined and construed by the courts of Mississippi, is that it is not a mere rule of evidence, but that it determines the character and legal effect of the contract evidenced by the bill of lading, making it conclusive evidence in the hands of every bona fide holder, whether by assignment, pledge, or otherwise, as against the person or corporation issuing it, that the cotton or other freight described in the bill of lading has been actually received for transportation, that the two bills of lading referred to were signed, issued, and delivered by the duly-authorized agent of said steamer and its owner, associated with others in the business of transportation under the name of the Southern Transportation Company, to said firm of McBath & Co., in the state of Mississippi, and with reference to the laws of said state, and that the libelant was and is the bona fide holder of said bills.

It is further averred that the said steamer negligently and carelessly left said cotton at People's landing near Riverside, Miss., uncovered and unprotected, and without guard or watch, and that no provision or security against fire was provided, nor any means to extinguish fire, whereby, and in consequence whereof, while said cotton was so lying on said wharf in the custody of said steamer or its agents, and after the signing, issuing, and delivery of said bills of lading, it was totally destroyed by fire, and wholly lost to the libelant, to his damage in the sum aforesaid.

The answer denies the receipt of the cotton, or that said steamer ever agreed to carry it, and avers that a short time prior to January 25, 1890, it was taken to People's landing, a little below Rosedale, on the Mississippi river, by said McBath & Co., and there delivered to the keeper of said landing, or some other party as agent of said McBath & Co., to hold for them for shipment "on some steamboat which should take it at said landing;" and while so lying upon said wharf, and in the custody of said owners or agents, it was wholly destroyed by fire.

The answer further sets forth that, if said bills of lading be held to be the bills of lading of said steamer, the provisions thereof are to the effect that, in the event of the destruction by fire of the property therein described, the carrier should not be responsible therefor.

Roelker & Jelke and Kittredge & Wilby, for libelant.

Ramsey, Maxwell & Ramsey and Stephens, Lincoln & Smith, for respondent.

SAGE, District Judge, (after stating the case.) The facts in this case are in the main undisputed. The Southern Transportation Company was neither a corporation nor a partnership. Each of the boats included in it did business solely on its own account. There was no community of interest, no sharing of profits or losses, The arrangement was that the boat first at a landing should take on its own account whatever freight was there deposited for shipment. The object in forming the association was to increase business by preventing delays and maintaining regularity in shipments. The boats

had regular dates and hours for leaving New Orleans and Cincinnati, but no time schedule for intermediate points, and the arrangement that the first boat should take the freight was made to prevent delays resulting from holding freight for particular boats.

When the bills of lading referred to in the libel were issued, James Burke was southwestern freight agent for the Cincinnati Hamilton & Dayton Railroad, with headquarters at Greenville, Miss., and had been employed in that capacity about five years. He had in his possession blanks of a joint bill of lading; the top part of it for steamboats, and the bottom part for railroads. On the 15th of September, 1889, he was authorized in writing by the masters, respectively, of the steamers Golden Rule, Mary Houston, Guiding Star, Sherlock, and U. P. Schenck, to sign the joint bills of lading in use between the Southern Transportation Line and the Cincinnati, Hamilton & Dayton road, and to represent their boats as agent for such business. This authority continued, and was unrevoked at the time of the issuing of the bills of lading aforesaid. The cotton referred to in the libel was purchased by McBath & Co. upon the order of the libelant. McBath & Co. made the purchase and took the bills of lading in their own name. They then drew at sight on the libelant for the amount, and attached the drafts, which were to the order of the bank of Rosedale, to the bills of lading, which they indorsed in blank, and had the drafts cashed by the bank, and the bank sent them forward. The cotton, as it was brought in, was placed in the cotton yard at Rosedale owned by Davis, cashier of the bank. The bill of lading, dated on the 15th of January, was signed by McGowan, Burke's clerk, in Burke's name, while the cotton was in Davis' cotton yard. McGowan testifies that he was sent to Rosedale by Burke, and authorized to sign his name to bills of lading for this cotton. The other bill was signed by Davis himself, in Burke's name, on the 22d of January, when the cotton therein described was yet in Davis' yard; and Davis testifies that he signed by verbal authority given him by Burke. The signature was at the end of the joint bill, which contained first a bill for the steamer, then, with a line separating, the bill for the Cincinnati, Hamilton & Dayton Railroad Company, stipulating that upon the arrival at Cincinnati, and delivery of the property "described in the above bill of lading" in good order to them as therein consigned, they would receive and forward the property. The portion of the bill relating to the steamer carriage stipulated for the delivery of the cotton at the port of Cincinnati, Ohio, and the description was of 138 bales of cotton marked "B. A. T. H. (138) shipped to order Jewett City, Conn. Notify Henry T. Bennitt, Norwich, Conn."

On the 22d of January, Davis, as cashier of the bank, issued a guaranty to Burke to deliver the cotton on the bank of the river at People's landing, which is about a mile from Rosedale. He testifies that Burke wished this as security that the cotton would be transferred from the cotton yard in Rosedale to the landing, and that it was delivered in accordance with the terms of the guaranty on the 25th of January, and placed within a foot or two of the water's edge. On the morning of the 26th it was discovered to be on fire. It had been left in the open air, uncovered, and there was no guard placed

over it. The testimony does not disclose the origin or the cause of the fire. The landing keeper who had charge slept that night in the warehouse, about 75 or 100 yards from the landing. McBath, having been notified of the fire, reached the landing about 2 o'clock in the afternoon of the 26th. The cotton was still burning, and all but about 75 or 100 bales, some of which was then smoking, had been consumed. These 75 or 100 bales were destroyed by the fire that afternoon and the night of the 26th. There were no engines or other appliances at hand to extinguish fire. McBath & Co. paid for the storage of the cotton on the landing. At the time of the fire the Guiding Star was below Rosedale, coming up the river. She was the first boat of the line that passed up after the bills of lading were issued. She passed Rosedale Monday night, January 28th, according to the testimony of Capt. Hegler, without landing, because she was not hailed, or notified to do so. The bill of lading dated the 15th of January recites that the 100 bales therein described were shipped "on board the good steamer called Sou. Trans. Co., or any other boat in the employ of same line." The bill of lading dated 22d of January, for 138 bales, recites that it was shipped "on board the good steamer called ———, or any other boat in the employ of same line." Capt. Hegler, of the Guiding Star, testifies that generally the boat's name was left blank in the bill of lading until it was known certainly what boat would take the freight, and that he had often received and taken on board freight with bills of lading made in the name of other boats, and in such cases he would have the name erased, and the name of the Guiding Star inserted, or, if the bill of lading was blank, would insert the name of the Guiding Star. The cotton was fully insured. An arrangement was made by the insurance company with the libelant, whereby the insurance company advanced to him the value of the cotton as a loan without interest, upon the understanding, it may fairly be inferred, that the libelant should prosecute the claim against the libelee, and, if successful, he should pay the loan; if unsuccessful, the loan should be converted into payment of the insurance.

The right of the libelant to prosecute the libel under this state of facts is challenged. The transaction with the insurance company did not divest the libelant of his title to and interest in the property, and was not a satisfaction of his claim either against the insurance company or the libelee. If it were, in terms, a satisfaction of the claim for insurance, it would not avail the libellee. The Monticello, 17 How. 152. That objection, therefore, is not well taken.

It is next objected that the Guiding Star is not mentioned in the bills of lading. The custom, in pursuance of the arrangement under which the boats of the Southern Transportation Line were associated, when bills of lading were issued, that the first boat should take the freight, and the fact, which is stipulated in the case, that the Guiding Star was the first boat, together with the testimony of Capt. Hegler that when bills of lading for freight which he took on board had been issued in the name of another boat of the line he erased that name, and inserted the name of the Guiding Star, or, if the bill of lading was in blank, he filled the blank, makes it immaterial whether the name

of the Guiding Star was inserted in the bill of lading or not. The bills stipulate for conveyance by steamer, and the name of the steamer is certainly not essential to their validity. Each bill is signed "James Burke, Agent," and, if that signature be valid,—which will be inquired into presently,—it is certainly competent to prove who was his principal; that is to say, for whom he issued the bills of lading, what arrangement existed between them, and what was the extent of his authority, so far as necessary to determine on whose account the bills were issued, and who incurred the liabilities arising therefrom.

But it is contended that the signatures were not authorized; that they were not made by Burke himself, and that he could not delegate his authority as agent for the boats. This objection, too, must be overruled. He was a general agent, and it was within the scope of his authority to authorize the signing of bills of lading by persons in his employ. It was necessary that bills should be signed at the various landings, and it was impossible for him to sign them all himself. It is true that he testifies that it was his habit to go on board the boats passing Greenville—his headquarters—on their way up the river, and sign bills of lading in person; but it appears from the evidence that that was not the only way in which bills were issued or signed, and that he gave express authority to McGowan, who signed the bill of the 15th, and Davis, who signed the bill of the 22d. The suggestion that there was no delivery of the cotton described in the bill of lading of the 22d because it was delivered by Davis, as owner of the yard, to himself as agent, which was no delivery, is not well founded. He had a right to act in both capacities, and the testimony is that on the 25th of January the cotton was in fact taken from his yard, and delivered on the landing, the place stipulated in the guaranty, and the usual and proper place for the deposit of freight of that character; and that was a delivery. What force and effect the Mississippi statute relating to bills of lading has in this cause, and to what extent, if at all, it applies against the libelee, will be considered later in this opinion. It may as well be said here, however, that its manifest purpose is to make bills of lading and warehouse receipts negotiable. It is not merely a rule of evidence, unless it be in the sense that every estoppel is a rule of evidence. It confers upon the bona fide holder by assignment or any other mode of transfer rights which are in the nature of vested property rights, and cannot be divested by bringing suit in another state, either in a local court or a federal court. McBath & Co. purchased the cotton in their own name, and in their own right. It is true they made the purchase to fill an order given them by the libelant, but it was none the less their purchase. They sold it to libelant, and the bank at Rosedale cashed sight drafts drawn on him for the price, having the bills, which were indorsed in blank, attached; and the payment of the drafts by the libelant completed the transfer to him as of the date of the cashing of the drafts.

Two questions remain to be considered: First. Whether the Mississippi statute so applies in this case as to estop the libelee from showing that the cotton did not come into the custody of the officers or owners of the boat. Turning to the amended libel, we find the

averment that the libelee "did not safely and securely carry and deliver the said cotton, as it had agreed to do, but failed so to do, negligently and carelessly leaving said cotton on the steamboat landing at Riverside, Mississippi, uncovered and unprotected, and not watched by said steamboat or its agents, who had made no provisions for security against fire, and had no means at hand to extinguish fire, whereby, and in consequence of said negligence, while so lying on said wharf after the signing, issuing, and delivering of said bills of lading, in the custody of said steamboat or its agents, the said cotton was totally destroyed by fire, whereby said cotton was wholly lost to libelant," etc. The libelant put in evidence the testimony of F. L. McGowan that the cotton described in the bill of lading dated January 15th was in the yard when the bill was signed, and that it was afterwards taken to the landing; and in the second deposition of Davis, which was taken by him, that McGowan wanted him at first to deliver the cotton to the boat, and that he told McGowan he could not do anything like that, because the boat might not be there for three or four days, but that he would guaranty its delivery on the landing, "where, of course, the landing keeper would be expected to take charge of it," and that McGowan said that that would be all right, "as all they wanted was to be certain that it would be delivered where the boats could handle it,—take it." It is stipulated and agreed by and between the parties that the Guiding Star was the first steamer of the line to pass going north after the cotton was taken to the landing. The libelant also, in the deposition of McBath, on cross-examination, brought out the fact that the cotton, when the bills of lading were signed, was in the possession and in the yard of Davis, manager of the cotton yard, and cashier of the bank of Rosedale. The libelant also offered testimony that the cotton was on the wharf, and uncovered, when it was burned, and relies upon the circumstances attending the burning to establish negligence. These items of evidence must therefore be regarded as in the cause for all purposes, and, if they conflict with the recitals of the bills of lading, the libelant, by introducing them, not only waived the estoppel under the statute, at least to that extent, but also opened the door for the introduction of testimony on those points by the libelee. It would not be tolerable to apply the estoppel under the statute so as to hold that the receipt of the freight on board the steamer cannot be denied in considering whether the proceeding in rem against the libelee can be maintained, and then allow the libelant to establish by evidence that it was not on board the steamer, but was burned on the landing before having come into the custody of the steamer or its officers, under circumstances creating a liability by reason of negligence. Moreover, the bills are signed, "James Burke, Agent," and, if the estoppel be in full force, it does not bar the inquiry whether he was acting within the scope of his agency, and who was his principal, for, if he was not acting within the scope of his agency, or had no principal, the estoppel is not destroyed or overcome, but it applies only to him personally.

The question, then, arises whether the proceeding in rem in admiralty can be maintained. The keeper of the landing, in whose

charge the cotton was left, was not the agent of the steamer. He also testifies—and there is no other evidence on that point—that he was paid storage by McBath & Co. for the cotton, and received it in storage, to hold until the coming of the steamer, which did not arrive until more than 48 hours after the cotton was destroyed by fire, and then was not hailed, and passed up the river without landing. It results that the bills of lading did not create liens against the vessel, and that the libel cannot be maintained. The Freeman v. Buckingham, 18 How. 182; Vandewater v. Mills, 19 How 82; Scott v. The Ira Chaffee, 2 Fed. Rep. 401; The Missouri, 30 Fed. Rep. 384; The Hermitage, 4 Blatchf. 474; The General Sheridan, 2 Ben. 294; The Keokuk, 9 Wall. 517; The William Fletcher, 8 Ben. 537; The City of Baton Rouge, 19 Fed. Rep. 461.

In The Freeman v. Buckingham, Mr. Justice Curtis, delivering the opinion of the court, says:

"Under the maritime law of the United States the vessel is bound to the cargo, and the cargo to the vessel, for the performance of a contract of affreightment. But the law creates no lien on a vessel as a security for the performance of a contract to transport cargo, until some lawful contract of affreightment is made, and the cargo shipped under it."

In Vandewater v. Mills, Mr. Justice Grier, announcing the opinion of the court, says:

"If the master or owner refuses to perform his contract, or if for any other reason the ship does not receive cargo, or depart on her voyage, according to contract, the charterer has no privilege or maritime lien on the ship for such breach of contract by the owners, but must resort to his personal action for damages, as in other cases."

The case of Bulkly v. Cotton Co., 24 How. 386, cited for the libelee, is authority for the proposition that the vessel is bound for the safe shipment of freight from the time of its delivery at the place of shipment and acceptance by the master. In that case the master of the vessel, which was then lying at the port of Mobile, agreed to carry a lot of cotton from that port to Boston for the freight mentioned in the bills of lading. The vessel, when fully laden, could not pass the bar which is situated a considerable distance below the city. Having received a portion of her cargo at the city, she was towed below the bar to receive the residue. The master signed bills of lading for the cotton, 100 bales of which were placed upon a lighter employed by the master to be conveyed to the vessel. After she had passed the bar and arrived at the side of the vessel, but before any part of the cotton was taken out, her boiler exploded, the cotton was thrown into the water, and the lighter sank. A portion of the cotton was taken up by the crew of the vessel, and carried to Boston with the bales which had been safely placed on board, and the residue of the 100 bales was in part wet and damaged and in part lost. The court held that the vessel was bound from the time of the delivery by the shipper and acceptance by the master, and that the delivery to the lighterman was a delivery to the master, "and the transportation by the lighter to the vessel the commencement of the voyage in execution of the contract; the same, in judgment of law, as if the one hundred bales had been placed on board the vessel

at the city, instead of the lighter." Referring to cases cited, including The Freeman v. Buckingham, in support of the contention that the vessel was exempt from responsibility upon the ground that the cotton was never laden on board, the court called attention to the fact that in those cases the goods were not only not laden on board the vessel, but they never had been delivered to the master, and, recognizing the law as laid down in that case, that the master not only had no 'general authority to sign the bill of lading and admit the goods on board when contrary to the fact, but that a third party taking the bill was chargeable with notice of the limitation, and took it subject to any infirmity in the contract growing out of it, drew the distinction that in Bulkly v. Cotton Co., the cargo was delivered in pursuance of the contract, and the goods were in the custody of the master, subject to his lien for freight, as effectually as if they had been upon the deck of the ship. In this case the goods were not delivered to the master. The testimony of Burke, the agent for the Southern Transportation Line and the steamers composing it, is explicit that he had no authority to sign bills of lading for cotton not actually delivered to the boat. The testimony also is uncontradicted, as has already been stated, that storage on the cotton while at the landing in charge of the landing keeper was paid by McBath, and that the landing keeper was not the agent of the libelee. It is clear, therefore, that this case does not fall within the ruling made in Bulkly v. Cotton Co.

In Pearce v. The Thomas Newton, 41 Fed. Rep. 106, also cited for the libelee, the freight was received by the steamboat company, and stored in its warehouse. But here, as we have seen, the freight did not come into the possession of the steamboat, but into the custody of the landing keeper, who was not an agent of the steamer. The authority of Burke was given in writing by the masters of the steamers forming the transportation company. It is as follows:

"You are hereby authorized to sign the joint bills of lading in use between the Southern Transportation Line and the C., H. & D. road, and to represent our boats as agent for such business."

In Pollard v. Vinton, 105 U. S. 9, where a bill of lading was issued by general agents of the steamer for cotton which was not shipped on the steamboat or delivered at its wharf or to its agents for shipment, the court said that it would probably be conceded that the effect of the bill of lading and its binding force on the defendant was no stronger than if signed by himself as master of his own vessel, and that in such case the proposition could not be successfully disputed that the person to whom such bill of lading was first delivered could not hold the signer responsible for goods not received by the carrier. The reasons why the master, even if owner of the vessel, cannot by waiver or stipulation create a lien on the vessel for goods not delivered, are, probably, that he cannot affect the rights of others who are maritime lien holders; and that a maritime lien exists only by virtue of maritime law, and no lien, unaccompanied by possession, can be created otherwise, excepting under and in accordance with statutory provisions. Further on, the court say:

"Before the power to make and deliver a bill of lading could arise, some person must have shipped goods on the vessel. Only then could there be a shipper, and only then could there be goods shipped. In saying this, we do not mean that the goods must have been actually placed on the deck of the vessel. If they came within the control and custody of the officers of the boat for the purpose of shipment, the contract of carriage had commenced, and the evidence of it in the form of a bill of lading would be binding; but without such a delivery there was no contract of carrying, and the agents of the defendant had no authority to make one."

That statement of law was made in construing the authority given by the owner of the vessel to the agents, and limited in terms to the execution and delivery to shippers of bills of lading for freight "shipped on defendant's steamboat Ben Franklin." The limitation, however, is the same as that which the law fixes upon the authority of masters of vessels, and the master could not give to the agent a greater authority than he himself had. My conclusion is that the master of the Guiding Star could not confer upon Burke authority to sign bills of lading for cotton not delivered to the steamer nor placed in the custody of her master or officers; that the cotton in question was not so delivered or placed; and that the libelant has no case against the libelee.

But, if this conclusion be wrong, we have the remaining question, to wit, whether the destruction of the cotton was the result of the negligence of the libelee. It was placed upon the landing, a mile or more distant from Rosedale, which is referred to by one of the witnesses as a very small town. Its population, according to the census of 1890, was 250. The landing was on a point with water on both sides, and the cotton was deposited within one or two feet of the edge of the water on the river side. The general rule that negligence will not be presumed without some evidence showing a state of affairs from which negligence can properly be inferred, (Lyndsay v. Railroad Co., 27 Vt. 643,) and that the burden of proof is upon the party setting up the negligence, is well established. Counsel for the libelant cite Mitchell v. Railway Co., L. R. 10 Q. B. 256, where bags of tow and flax in possession of the defendant under an agreement to hold as warehouseman at the owner's sole risk were damaged by water, and it appeared that they had been stacked in the open air, without being raised above the ground, as they should have been, and that the tarpaulins placed over them were insufficient, and let the rain through. The verdict for the plaintiff was sustained, Blackburn, J., saying:

"The liability of an ordinary bailee is to take ordinary and reasonable care. But, if the defendants in this case are under that liability, there is ample evidence that they did not do that."

It appeared that the damage resulted from the negligence specified.

In Chenowith v. Dickinson, 8 B. Mon. 156, a merchant had stored barrels of salt consigned to him in a frame warehouse on an alley back of his business house. Some of them were stolen by a thief, who effected his entrance into the warehouse through a hole occasioned by a plank being off the side or rear of the building, and the court properly held the merchant liable for that negligence, which it appeared afforded ingress to the thief.

In Morehead v. Brown, 6 Jones, (N. C.) 367, a bailee for hire of cotton placed it in an open lot, and left it there uncovered. When delivered to him it was in bad order by reason of want of rope, and of the bags being torn and rotten. The season was rainy, and the cotton, sinking into the soft ground, was damaged. The plaintiff obtained a verdict, which was sustained on appeal. In this case also the negligence complained of was shown to be directly the cause of the damage.

In Railroad Co. v. Faler, 58 Miss. 911, cotton in transportation under a bill of lading excepting liability for loss by fire was burned, but the evidence did not disclose how the cotton ignited. It was being transported upon flat, open cars. The court affirmed the judgment below, (which had found negligence on the part of the carrier in the use of such cars for the transportation of cotton,) saying that cotton was very inflammable, easy to ignite, and hard to extinguish; and that ordinary prudence would suggest that it should be stored in cars of such construction as would give the largest measure of security. This case is clearly within the general rule stated above that negligence will not be presumed without some evidence showing a state of affairs from which it can properly be inferred. Then comes the case of Manufacturing Co. v. Steamboat Co., 50 N. Y. 121, where freight was delivered by the steamboat company upon its wharf at the city of New York early on the morning of the 4th of July, 1886. A fire broke out on the wharf on the morning of the 5th, and consumed the cotton. Loss by fire was a risk excepted in the bill of lading, and the question was whether the fire resulted from the negligence of the defendant. The steamboat company had a private watchman and two colored men, whose duty it was to be upon the wharf on the night of the fire. There was evidence tending to show that the fire originated upon the wharf, and that there were no means there to extinguish fire. The steamboat company did not produce as witnesses the private watchman, nor either of the two colored men referred to, nor did it appear that there was any person upon the wharf when the fire broke out. In the court below a verdict for the defendant was directed upon the close of the plaintiff's testimony, and judgment entered upon the verdict. The court of appeals reversed the judgment, saying that enough was shown to call upon the defendant to explain the circumstances attending the destruction of the property, and that, in the absence of any such explanation, the jury would have been authorized to infer the want of proper precautions for its safety; also that the plaintiff's evidence of the absence of means for extinguishing fire, although not of the most satisfactory character, was sufficient to put the defendant upon proof, and that the defendant, possessing the best means of proof upon that subject, offered no testimony with regard to it; also that the fact that the fire originated on the defendant's premises, in connection with the failure of the defendant to offer any explanation of its origin, or even produce any of the persons said to have been left in charge, or to show that they performed their duty, or that any effort was made to take the goods out of the reach of the fire, were circumstances from which the jury might have drawn inferences

unfavorable to the defendant on the question of negligence, and that the nature of an accident may afford prima facie proof of negligence, and that negligence may be inferred from the circumstances of the case. I have no doubt of the correctness of that decision, but in the case of The Buckeye, 7 Biss. 23, a propeller caught fire and was destroyed at the wharf at Detroit. It was claimed by the libelant, who had shipped on the propeller a quantity of merchandise for Chicago under a bill of lading which excepted loss by fire, that the fire was the result of negligence on the part of officers of the boat. The court said that there was no proof how the fire originated. From the statement of the case it appears that while the propeller was embarking passengers she was found to be on fire in the hold, near the boiler. The court said that the evidence was clear that the boat was as well protected against fire as any vessel that ordinarily navigates the lakes, and that negligence could not be inferred from the fact that the boat was on fire. In each one of the cases cited for libelant the facts proven bore a direct relation to the loss complained of. No such relation appears here. The presumption that cotton laden on flat, open cars, and uncovered, took fire in transit from sparks from a locomotive, has no bearing upon a case where cotton is stored upon a bank at a landing in the country on the River Mississippi, and a mile away from a little hamlet, the only settlement in the vicinity. There was no reason to anticipate destruction of the cotton by fire, and no occasion, in the exercise of ordinary prudence, to take any precautions against fire; nor would it be reasonable to say that appliances for the extinguishment of fire should have been provided, as might be expected where freight was stored upon a wharf in the city of New York. McBath, who purchased the cotton on an order from the libelant, knew that it was placed on the landing, and not only made no objection, but paid the storage. But counsel for libelant call attention to the fact that Burke testifies that he made an investigation into the cause of the fire, and ask, "Where is the result of it?" insisting that, if the investigation had developed anything favorable to the libelee, the facts would have been disclosed. When we turn to Burke's deposition, however, we see that he had no personal knowledge of the facts, and that he derived his information from the agent of the insurance company, which, as has already been stated, it is fair to infer stands behind the libelant, and is the promoter of this litigation. Burke tells us that the agent of the insurance company, who had been investigating the matter, and from whom he derived his information, assured him that the cotton was burned by McBath's men, and that, if he had the evidence of one or two more witnesses, he could put them into the penitentiary. Upon this state of facts, the fair presumption is not that suggested by counsel for libelant, but, on the other hand, that the agent of the insurance company had, upon investigation, satisfied himself that the fire was the work of incendiaries, actuated by hostility to McBath, and that the evidence was not produced for the libelant in this cause because it would negative the averment of negligence. It is urged also that there was no watch placed over the cotton, but surely, unless the failure to adopt every preventive

agency suggested by afterthought can be reckoned negligence, there was no occasion, in the exercise of due care, to set a watch over a lot of cotton while upon a landing at so lonely a place. Had the cotton been stored in the warehouse,—which, however, did not belong to, and was not under the control of, the libelee,—the probable result would have been that that would have been fired to accomplish the destruction of the cotton. My conclusion is that the averment of negligence is not sustained, and that the loss was within the exception of the bill of lading. The libel will be dismissed, at the costs of the libelant.