JUDD et al. v. NEW YORK & T. S. S. CO.

(Circuit Court of Appeals, Third Circuit. July 15, 1902.)

No. 18.

1. CARRIERS—ACTION FOR LOSS OF GOODS—QUESTIONS FOR JURY.

A steamship company received from a connecting carrier a consignment of wool, which it placed in its shed adjoining the dock to await shipment, and while there the shed and its contents were destroyed by fire, which originated in an adjoining shed owned by others. Both sheds were of wood, and very dry, and the one in which the fire originated contained a large quantity of jute, which was very inflammable, and particularly exposed to danger from fire. In an action by the owner to recover the value of the wool, there was evidence tending to show that the company had knowledge of the condition of the adjoining shed, and that it had no watchman, and little, if any, fire protection; also that while defendant employed a watchman its shed was not as well constructed to withstand a fire from the outside as others along the docks, and that there were no fire hydrants within easy reach, as there were in the case of other sheds. Held, that upon such evidence the question whether defendant exercised due care for the protection of plaintiff's goods was one upon which reasonable men might fairly differ, and which it was the province of the jury to determine.

**2. SAME—LIABILITY AS WAREHOUSEMEN—LOSS OF GOODS BY FIRE.**

The fact that a carrier which placed goods received for shipment in its warehouse took adequate precautions against fire on its own premises does not exonerate it from liability as a matter of law for the destruction of the goods from a fire originating on adjoining premises which it did not own nor control, although such fire was so violent that it was impossible to prevent it from spreading to its own building, where it had full knowledge of the manifest danger to its own premises arising from the specially hazardous condition of those adjoining, and took no means to guard against it. Under such circumstances, it may have been culpable negligence, and a breach of duty as a bailee for hire, to place the goods in such warehouse.

**3. SAME—ACTION—EVIDENCE.**

In an action by the owner of goods against a carrier to recover for their loss by fire through the alleged negligence of defendant, evidence to show that plaintiff has received a conditional payment on account of the loss from an insurer and to establish an estoppel against the insurer is irrelevant, and inadmissible, the right of action being in the plaintiff upon the contract, and unaffected by any subsequent transaction between him and the insurer.

Acheson, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Eastern District of Pennsylvania.

See 112 Fed. 1023.

John F. Lewis, for plaintiffs in error.
N. Dubois Miller, for defendant in error.

Before ACHESON and GRAY, Circuit Judges, and BRADFORD, District Judge.

GRAY, Circuit Judge. This was an action in tort, brought by H. C. Judd and Root, of Hartford, Conn., plaintiffs below and plaintiffs in error here, against the New York & Texas Steamship Company, popularly known as the "Mallory Line," the defendant in error, to recover the sum of $26,538.88, the value of 869 bales of wool, destroyed by fire on July 2, 1896, while in the custody of the defendant, at Galveston, Tex. This wool came into the possession of the defendant by a shipment from the interior of Texas, on the 27th of June, 1896, upon two bills of lading of the San Antonio & Aransas Pass Railroad Company. At Galveston, it was taken charge of by the defendant, to be shipped to Hartford, Conn., by one of its steamers scheduled to sail a week later, and while awaiting shipment, was stored in a frame shed on the Gulf front, known as the "Santa Fé Shed," owned and occupied by defendant. This shed was about 400 feet long, and was situated a few feet, on its north side, from the wharf front to which it was parallel. It had what was known as a shell roof—that is, a board roof covered with tar paper and pitch, upon which shells had been placed while in a soft state. Immediately adjoining this shed, and separated from it only by a frame partition, was a shed known as the "Labadie Shed," owned by the Galveston Wharf Company, and occupied by the Galveston Bagging Company. This shed was 475 feet long. It was in line with the "Santa Fé Shed," and, like it, ran

¶ 2. Liability of carriers as warehousemen, see note to Wade v. Lumber Co., 20 C. C. A. 529.

parallel with the wharf front, which was on its north side only a few feet away. It had the same pitch and shell roof that the other shed had, was open its entire length on the south side, to the height of from 12 to 16 feet, and, like the "Santa Fé Shed," was built of Texas pine. Along this south side ran numerous railroad tracks, along which switch engines operated off and on day and night, frequently throwing sparks while so running, and witnesses testified that fires had several times that summer been started from these sparks. The uncontroverted evidence was, that in this "Labadie Shed" there had been stored, for a period of several months prior to the destruction of plaintiffs' wool, between 6,000 and 8,000 bales of jute butts, and it is likewise uncontroverted that this is a highly inflammable material, which would instantly ignite from a spark. It is not denied that this jute had become dry and loose, and was scattered all over the floor and near the railroad tracks. The testimony also showed that this shed was without a watchman or fire appliances of any kind, and that it was a resort for loafers and tramps, who were seen there every day on top of the bales, playing cards or sleeping. It was also in evidence that a long season of drought had preceded the fire, in consequence of which all the sheds had become dry and inflammable. The testimony tended to show that the "Labadie Shed" was not built as a warehouse for storage purposes, but was adapted only for the temporary care of merchandise about to be transshipped, the cars coming down on the open south side, and the vessels lying at the wharf front on the north side. These conditions, as to which there was no conflict of testimony, were such as ought to have been known by defendant's agents and officers. Defendant's watchman, however, testified that he had observed the unprotected situation of the "Labadie Shed" and the fact that it was the resort of idle persons, and had mentioned it to the defendant's agent, who visited the wharf every day, and also to the superintendent. There was also testimony tending to show that proximity to such a shed was dangerous, because it was open on the south side and free to access by everybody, and unprotected from the sparks of passing locomotives. There was also testimony tending to show that, while there were some barrels of water and buckets in the "Santa Fé Shed," in which the plaintiffs' merchandise was stored, there were no fire hydrants near the shed, and no hose on hand sufficient to make available the fire hydrants that were from 100 to 300 feet away, alongside of other sheds. There was also evidence tending to show that other sheds along this water front, used for similar purposes, were differently constructed, being built with standard 18-inch fire brick partition walls extending above the roof and supplied with hydrants, hose and fire pumps. This being the condition of things, a fire broke out in the "Labadie Shed" on the afternoon of July 2d, burning so fiercely and spreading with such rapidity as to be beyond the control of the fire department of Galveston, when it arrived upon the scene. The fire spread rapidly to the "Santa Fé Shed," and in a short time, it with its contents was entirely destroyed.

The learned judge of the court below submitted the case to the jury, and in doing so, delivered a charge at some length, in which, after discussing certain aspects of the case with which we are not here concerned, used the following language:

"There remains, therefore, what seems to me to be the only question that I should be justified in submitting to you, and for the present, I shall submit to you. For the present, I say to the jury that the question is a question of fact for their determination, and they will take the evidence and decide upon it. I shall reserve the question for further consideration, whether there is any evidence to go to the jury in support of the plaintiffs' claim. For the present I shall ask you to determine whether the defendant was negligent in the only particular that is left, viz.: whether having received the wool and having put it into its shed, it omitted any duty which it fairly owed to the shippers, under all the circumstances disclosed by the evidence.

"Negligence, as you know, is the absence of due care according to the circumstances of any particular case. A man's duty varies according to the circumstances in which he is put. There are times when his duty may be more exigent than at another time. Circumstances and surroundings may be such as to call for more care at some times than at other times. Therefore, it is impossible, in most cases, to lay down any general rule. All that a court can say to a jury is what I have just said to you, that negligence is the absence of care according to the circumstances of the particular case. For example, take the testimony as you have heard it, consider the surroundings of this place of storage, of this shed, consider the material of which it was made, its neighborhood to other structures, the precautions that they took against fire, the proximity to the railroad, the presence or absence of a watchman in their own shed and in the neighboring shed, and other circumstances that the testimony may disclose. I do not pretend to narrate them exhaustively. Take all that may bear on the defendant's duty, and decide whether it did what a reasonable, prudent man, under all the circumstances, would have done. It certainly owed the duty of care to the shipper. Did it discharge that duty? For example, did it have sufficient appliances to put out any ordinary fire, such as under ordinary circumstances might fairly be anticipated? Of course, it was not bound to have appliances at hand such as would enable it to keep off fire from its premises under all circumstances. It did not guaranty that no fire could spring up that would attack its warehouse successfully. All that the duty of care could impose upon it would be to provide such reasonable precautions as a prudent man would ordinarily take. It had, as you will recall, various appliances. The testimony will enable you to determine what they were, and you must decide whether they were fairly sufficient under all ordinary circumstances. They did watch these premises to a certain degree, I do not know how much. The testimony does not seem to disclose that it was negligent in that particular. The jury will determine how that was."

We quote this passage from the charge, not because there is any exception to it by the plaintiffs in error, for, as will be seen hereafter, what the court said or did not say in its charge, is not before us for review; we only refer to the passage just quoted as a clear and proper statement of the law applicable to the case, as far as it was submitted to the jury, without commenting upon the language of the court, which seems to confine the question of negligence to the period of time after the wool had been received and put into the defendant's shed. It appears from the record, that after the jury had been out for a number of hours, they came into court and asked for further instructions, and the learned judge of the court below instructed them, briefly, as follows:

"Gentlemen: Your communication to me states that you desire me to explain more fully what constitutes negligence and concerning the amount of care the defendants were obliged to use prior to July 2d, or upon that date. I am very much afraid that I cannot be able to do more than repeat what I said to you before. I cannot lay down any rule for you to follow, with regard to this case, except the rule that I have given you, that negligence is the absence of care according to the circumstances. What sort of care

did the circumstances that have been proved fairly require? What would an ordinarily prudent man have been likely to do in caring for property intrusted to his charge? I cannot say, for example, there seemed to have been five hydrants there and there ought to have been six, or that there seemed to have been a two inch nozzle from the hydrant and there ought to have been a three or four inch nozzle. It is impossible for me to give instructions of that kind to the jury. The law does not lay down any rules in such detail and, in cases of this sort that are indeterminate in their nature, it requires the jury to consider all the surrounding circumstances and then decide what would have been done by an ordinarily prudent man under such circumstances and in such surroundings, in caring for property intrusted to his charge.

"I trust I make that clear. It is really all that I can say to you. I cannot take up these details and say, 'Now, in my opinion this work was carelessly done,' or 'This was not carelessly done.' It is not for me to do that at all; and I must turn the whole subject over to you, for you to apply the rule that I have just indicated."

We quote this supplementary instruction, for the reason stated in regard to the quotation from the first charge of the court; that is, because it repeats with admirable clearness and emphasis the distinction that the learned judge at first made, with reference to the facts of this case, between the functions of the court and jury. Afterwards, the jury returned, and announced to the court that they were unable to agree upon a verdict. Whereupon, the learned judge of the court below directed them to render a verdict for the defendant. This the jury accordingly did.

The action of the court below, in thus withdrawing the question of negligence from the jury and directing a verdict for the defendant, was excepted to by the plaintiffs, and is the ground upon which, what we regard as the principal assignment of error is based. The whole of the evidence has been made part of the record, by bill of exceptions duly sealed, and we have carefully considered the same in connection with the assignment of error just referred to.

The power of a court, when the evidence in a case has been closed, to withdraw it altogether from the jury and direct a verdict for plaintiff or defendant, as the one or the other may be proper, is a very important and salutary one. Where the evidence is undisputed, or is of such conclusive character that the court, in the exercise of a sound judicial discretion, would be compelled to set aside a verdict returned in opposition to it, the practical assertion of this power is salutary and promotive of the ends of justice, and does not conflict with the constitutional right to a trial by jury. The proper function of a jury does not begin, until there has been evidence submitted to it of facts, from which, in such a case as this, negligence may be reasonably inferred. If there has been no evidence adduced by the party upon whom the onus of proof is imposed, establishing or tending to establish such facts, there is nothing for the jury to consider, and it is the duty of the court to say so, and not leave the issue to be determined by the possible caprice or prejudice of those composing the jury. This is now the well-settled doctrine and practice of both English and American courts, and has been sanctioned by numerous decisions of the supreme court of the United States. Ryder v. Wombwell, L. R. 4 Exch. 36; Jewell v. Parr, 13 C. B. 916; Toomey v. Railway Co., 3 C. B. (N. S.) 150; Giblin v. McMullen, L. R. 2 P. C. 335; Railway Co. v. Jackson, 3

App. Cas. 193; Pleasants v. Fant, 22 Wall. 116, 22 L. Ed. 780; Improvement Co. v. Munson, 14 Wall. 448, 20 L. Ed. 867; Commissioners v. Clark, 94 U. S. 284, 24 L. Ed. 59; Motey v. Granite Co., 20 C. C. A. 366, 74 Fed. 155.

It is, however, equally important that a court should not, merely upon its own conclusion, as to what should be the proper determination of a question of fact, invade the province of the jury, and substitute its own judgment for theirs, when that question is one about which reasonable men might differ.

A careful reading of the evidence in this case, as it is presented in the record, inclines us to consider the question of negligence in this case, to be one "about which reasonable men may fairly differ." There was certainly testimony tending to show a condition of more than ordinary hazard in and about the premises, in which plaintiffs' goods were stored by the defendant. Defendant was a bailee for hire, and owed to the plaintiffs the duty of bestowing upon the goods committed to its charge, the care which an ordinarily prudent person would take as to his own property, under the circumstances surrounding him. The plaintiffs had no part in the selection of the place of deposit. We cannot say that in this case there was no evidence which the jury could consider, tending to show, on the part of the defendant, a want of that due care, in providing for the safety of plaintiffs' goods, which, under the peculiar circumstances existing, it owed to the plaintiffs. There was evidence adduced on the part of the plaintiffs, which at least tended to show a more than ordinary fire hazard, to which goods stored in the "Santa Fé Shed" were necessarily subjected, and there was also evidence tending to show a want of adequate precautions against such hazard on the part of the defendant. The evidence may have been, and probably was, conflicting as to the appliances usually found in such places in cities, for the prompt extinguishment of a fire, but there certainly was some testimony to the effect that there were no fire hydrants within easy reach of this highly inflammable "Santa Fé Building," and none at all readily available for the "Labadie Shed," in which were piled up thousands of bales of jute, much of which had become loose and was scattered about the floor. This material was admitted to be highly inflammable, and it was testified that it was specially exposed to ignition from passing locomotives or from the carelessness of the tramps that infested the shed. Furthermore, it is not denied that there was no watchman of this shed at all.

The learned judge of the court below, in the passage from his charge, which we have already quoted, correctly defined, in general terms, the degree of care required by law from the defendant, in regard to the wool received from the plaintiffs, and correctly instructed them that a want of care, thus defined, would be culpable negligence on the part of the defendant, for which it would be liable to the plaintiffs, and that, whether such culpable negligence was established by the evidence, was a question of fact for their determination upon all the evidence in the case.

But the attitude of the court below, as regards one phase of the general question, as to whether there was culpable negligence on the part of the defendant, or not, must now be noticed. Certain language

used by it seems to sanction the contention of the defendant here, that if proper precautions had been taken against fire on its own premises, no responsibility attached to it by reason of a fire starting on, and communicating from, adjoining premises, not owned or occupied or controlled by it, and which was so violent in character as to defy any resistance that could possibly be opposed to it. This contention practically ignores the responsibility attaching to defendant, by reason of the manifest danger to its own premises, arising from the specially hazardous conditions existing on the adjoining premises. To the proposition involved in this contention, we cannot agree. The evidence tending to show these dangerous conditions, and the special hazard of fire to defendant's property, arising therefrom, is not contradicted. We have already called attention to the fact that there was testimony tending to show that these conditions were known to and recognized by certain controlling officers of the defendant company, and we again repeat that the danger, as testified to, was so manifest and open as to affect the defendant with knowledge, even in the absence of direct testimony in that regard. It will not do to say that, because these conditions existed upon adjoining property not under the control of the defendant, they could not be guarded against. A dangerous condition on one's own property may exist by reason of, and be entirely owing to the existence of, dangerous conditions on an adjoining property. This is especially true as to the danger of fire. This dangerous condition, though derivative and not primary, if it is recognized, can be guarded against. Special watchmen placed near the adjoining property may diminish this danger, and it might be avoided altogether, so far as movable property is concerned, by declining to expose it to the risk, or by removing it therefrom. Whether the situation was unusually hazardous to the knowledge of the defendant, and whether, if it were, it was negligence in defendant, in the face of such hazard, to place the plaintiffs' wool in the "Santa Fé Shed," or whether, having placed it there, it took such additional precautions as were available and proportioned to the special danger involved, were questions for the jury, under all the evidence in the case. Hardman v. Railroad Co., 27 C. C. A. 407, 83 Fed. 88, 39 L. R. A. 300; Thomas v. Lancaster Mills, 19 C. C. A. 88, 71 Fed. 481; Tanner v. Railroad Co., 108 N. Y. 623, 15 N. E. 379; Hewett v. Railroad Co., 63 Iowa, 612, 19 N. W. 790.

The evidence bearing upon this phase of the case, as well as that more especially concerning the provisions made by the defendant itself, for protection against fire on its own premises, all being relevant to the general question of negligence on the part of the defendant, was, in our opinion, such as to require a submission of that question to the consideration of the jury, and we are of opinion that the court erred in withdrawing it therefrom.

It would not be necessary to notice the second assignment of error, were it not that the disposition of this case will involve a new trial, and it is important that the views of this court should be expressed in regard to the subject-matter of that assignment.

Evidence was admitted, against the objection of the plaintiffs, to show that the wool was insured in the Insurance Company of North

America, and that the insurance money had been paid to plaintiffs, under an agreement that the money should not be repaid, unless plaintiffs were able in this suit to recover it. This evidence was offered by defendant, avowedly for its bearing upon the question of negligence. It was to show that the insurance company was the real plaintiff, and that as it, with other insurance companies, had a uniform rate of premium for insurance on the sheds, it was estopped, as real plaintiff, from saying that the risk was unusually hazardous.

The payment made by the insurance company to the plaintiffs was, as shown by the receipt in evidence, a conditional loan, and not a payment. It did not destroy plaintiffs' right of action against the defendant, nor put the insurance company in the situation of a real or nominal plaintiff, so that its admissions or conduct could be taken in any wise to affect the real plaintiff by estoppel, or otherwise. Even if the loss had been out and out paid, the equitable right of subrogation inuring to the insurer, would only authorize him to use the name of the insured in an action against one, whose failure of duty to the insured caused the loss. There is no contract or privity between the insurer and the defendant. In St. Louis, I. M. & S. R. Co. v. Commercial Union Ins. Co., 139 U. S. 223, 11 Sup. Ct. 554, 35 L. Ed. 154, the court say: "By the strict rules of the common law, it (the right of the insurer) must be asserted in the name of the assured, but in any form of remedy, the insurer can take nothing by subrogation but the rights of the assured, and if the assured have no right of action, none passes to the insurer." The rights in litigation in this case are those which accrue out of the contractual relations existing between the plaintiffs and the defendant company. No others are the subject of discussion or determination, and nothing that passed between the plaintiffs and the insurance company can affect those rights. The transaction between the insurance company and the assured was, therefore, without relevancy, and was incompetent as evidence in the case.

The judgment of the court below is reversed, and a venire de novo awarded.

ACHESON, Circuit Judge. I dissent from the judgment of reversal in this case. The bill of lading under which the defendant company received and held the plaintiffs' wool contains a stipulation exempting the company from liability for loss by fire. Now, it appeared in the plaintiffs' own case that the wool was destroyed by fire which originated, not on the defendant's premises, but elsewhere, and spread irresistibly to the defendant's wharf shed, causing its total destruction, together with its entire contents, including the wool. It was therefore incumbent upon the plaintiffs to show clearly that the defendant was guilty of negligence which occasioned or contributed to the loss complained of. In my judgment, the plaintiffs wholly failed to show this, and there was no evidence to support a verdict against the defendant.

It appeared that the port of Galveston was provided along its water front with wharf sheds, precisely like the defendant's "Santa Fé Shed,"

designed and used for the temporary storage of goods in transit, and that they were habitually used by transporters engaged in the same business as was the defendant, to temporarily house goods in the possession of the carrier awaiting shipment. The plaintiffs were chargeable with knowledge of the conditions at the port of Galveston in respect to the accommodation of goods in transit and of the common method there practiced by transporters of handling and caring for goods awaiting shipment at the wharves. Undoubtedly the plaintiffs' Texas agent, who selected the Mallory Line for the transportation of the plaintiffs' wool, well knew that if upon the delivery by the railroad company of wool at the defendant's wharf there was no vessel in port to receive it the wool would be stored in the defendant's wharf shed until the next incoming vessel arrived. I cannot, then, agree to the statement to be found in the opinion of the court: "The plaintiffs had no part in the selection of the place of deposit." This, I think, is a serious misapprehension. The parties must be taken to have dealt with each other with regard to the common and notorious practice at the port of Galveston as to the storage of goods in transit. The plaintiffs had no right to expect the defendant to depart from the ordinary course of business. It would have been an unusual thing for the defendant to remove the wool from its wharf and store it elsewhere, and, indeed, this could not have been done except at the defendant's risk, not to speak of the expense.

The evidence was convincing that the "Santa Fé Shed," in which the defendant placed the plaintiffs' wool, was built of the same materials and in the same manner as the other wharf sheds in the port of Galveston, and that in construction it was as safe from the hazard of fire as any of the wharf sheds used for the temporary storage of goods in transit by other persons or companies engaged in the same business at that port. The shell roof was regarded as fireproof, and was rated by insurance companies as equal for safety to a tin roof or a slate roof. It clearly appeared, I think, that the defendant made reasonable provision, such as a prudent man would ordinarily make, to meet and arrest any ordinary fire. Testimony as well on the part of the plaintiffs as on the part of the defendant showed that in the "Santa Fé Shed" there was an ample supply of barrels and buckets, properly distributed, all filled with water, and also, according to the defendant's witnesses, a number of hand grenades. There was no hydrant within the shed, but the defendant company had on its premises, within easy reach of the "Santa Fé Shed," private hydrants or fire plugs,—three according to the plaintiffs' witness, and five according to the defendant's witnesses,—each supplied with hose, and the several lengths of hose would be coupled together in an emergency. Moreover, the defendant kept on its premises several watchmen, on duty day and night, one being on duty in the "Santa Fé Shed" at the time the fire started.

But, even if it appeared that the "Santa Fé Shed" lacked some of the usual appliances for the prompt extinguishment of fire, that circumstance would have no importance here. No precautions or vigilance within any reasonable limits could have availed to avert this loss. The wool was destroyed in an overwhelming catastrophe. The fire

was beyond control before it touched the "Santa Fé Shed." The fire department of the city of Galveston—summoned by telephone—was promptly on the ground, with its appliances, while the fire was yet confined to the pile of jute butts in the "Labadie Shed." But the roof of that shed soon took fire, burning fiercely and with great rapidity. Then the fire spread quickly and resistlessly to the "Santa Fé Shed." The firemen with all the appliances of the city fire department at their service were unable to arrest the fire until after the "Santa Fé Shed" and its contents were entirely consumed.

The fire occurred soon after midday, and commenced in the pile of jute in the "Labadie Shed" at a point about 30 feet in from the south side of the shed, and about 50 feet from the "Santa Fé Shed." How the fire originated did not appear and is not known. Certain it is that it was not due to any act of the defendant company or its servants. Nor could the defendant have done anything to prevent the fire. The defendant had no control whatever over the "Labadie Shed" or any right of supervision. The occupant, the Galveston Bagging Company, was engaged in a lawful business, the making of jute bagging, and had a legal right to store jute in that shed. Jute was and is imported into Galveston, and there used, in large quantities; for Galveston is a great cotton shipping port, and out of jute is made the bagging which covers all exported cotton.

It is difficult to perceive how the employment by the defendant of additional watchmen on its premises (as suggested in the opinion of the court) would have tended to prevent or mitigate this fire. The intimation in the opinion that the defendant should have declined to put this wool in its wharf shed for temporary keeping while awaiting shipment upon one of its vessels is a surprising suggestion. If the mere temporary storage in its wharf shed of this wool involved negligence, then the defendant could not have stored therein for any length of time any goods in transit except at its peril. The result would be that the defendant could not conduct business in the approved and customary way at the port of Galveston because the occupant of adjoining premises had in store a lawful article of commerce, much dealt in at that port, and which the evidence shows is not a whit more inflammable than is cotton, and little more inflammable than is Texas wool itself. These three commodities—jute, cotton, and wool—are the principal articles of import and export at the port of Galveston, and they are constantly brought into proximity at the wharves of that port. All this (which the evidence demonstrates) these shippers, the plaintiffs, must be presumed to have known. Against the risk from contact with jute and cotton they protected themselves by insurance on this wool.

I am not able to bring myself to the view that the defendant company incurred any liability to the plaintiffs growing out of the presence of jute in the "Labadie Shed" or the manner in which that shed was kept by its occupant.

Upon the whole case, I do not see how the court could have permitted a verdict for the plaintiffs to stand. The case, I think, was one for peremptory instructions in favor of the defendant, under the rule laid down by the supreme court in Patton v. Railroad Co., 179 U. S. 658,

21 Sup. Ct. 275, 45 L. Ed. 361, and enforced by this court in Railroad Co. v. Martin, 49 C. C. A. 474, 111 Fed. 586.

I think that the trial judge was entirely right in directing the jury to find a verdict for the defendant, and I would affirm the judgment.