### BRADLEY v. LEHIGH VALLEY R. CO.

(District Court, S. D. New York. March 8, 1906.)

**1. SHIPPING—DAMAGE TO CARGO—NEGLIGENCE OF TUG AND TOW.**

Damage to a cargo of wheat, through the sinking of a canal boat in a dock, *held* not to have resulted from unseaworthiness, but to have been due to the pushing of the boat by her towing tug into the slip, while it was filled with ice, which was done at the request of the master of the boat, and for which both tug and tow were chargeable with negligence.

**2. TOWAGE—LIABILITY OF TOWING TUG—HARTER ACT.**

The Harter Act (Act Feb. 13, 1893, c. 105, 27 Stat. 445 [U. S. Comp. St. 1901, p. 2946]) has no application to the question of the liability of a tug for damage to the cargo of her tow, which arises upon a contract of towage and not of affreightment.

**3. INSURANCE—ASSIGNMENT BY INSURED OF CLAIM AGAINST CARRIER—RECOVERY BY INSURER.**

A cargo insurer, under a policy which provides that the insurance shall not inure to the benefit of any carrier, and shall be null and void to the extent of any amount recoverable by the insured from any carrier, who has advanced to the insured the amount of a loss as a loan and taken an assignment of a claim for the loss against the carrier, may recover thereon, notwithstanding a provision of the bill of lading that the carrier shall have the benefit of any insurance effected by the owner.

In Admiralty. Action for loss of cargo.

Black & Kneeland, for libellant.

Robinson, Biddle & Ward, for respondent.

ADAMS, District Judge. This was an action brought by Herbert Bradley, the assignee of C. E. Nourse & Company of Toronto, Canada, to recover from the Lehigh Valley Railroad Company, for the benefit of the Sea Insurance Company, Limited, the damages incident to the sinking of a part of 7,890 bushels of wheat, the cargo of the canal boat A. J. Dean, at the foot of 42nd Street, Brooklyn, on the 23rd day of January, 1903. The libellant's allegation was that the boat was old and weak and injured by being brought in contact with ice while

being towed to 42nd street; that the damage to the wheat was due to negligence on the part of the respondent in loading it upon an unseaworthy boat and in towing her in the night time when the river and harbor were full of floating ice. The respondent denied that the Dean was a weak boat or old in the sense of being infirm or used up or that it was guilty of any negligence; further that C. E. Nourse & Company effected insurance on the grain and has been paid for the loss by the underwriter and has no cause of action against the respondent.

The following stipulation was entered into by the parties and constitutes libellant's evidence, viz.:

"The following facts are agreed upon and admitted by the parties to this action.

The 4500 bushels of wheat laden on the canal boat 'A. J. Dean' on January 23, 1903, were received by the respondent from its connecting railways and were transported over respondent's lines to New York.

Said wheat was carried and transported under certain through bills of lading issued to the shippers by the respondent's connecting carriers, by which the carriers agreed to deliver said wheat at New York to steamers of the Prince Line. Each of said bills of lading contained the following proviso:

'In case of any loss or damage to goods for which this Company or connecting lines or other carriers may be liable, it is agreed that the Company or line or carrier so liable shall be given the benefit of any insurance by or for account of the owner of said goods and shall be subrogated in such rights before any demand shall be made on them in respect of such loss or damage, and in case of any liability whatsoever the Company shall only be liable for the invoice value at the point of the shipment.'

Prior to the 23rd day of January, 1903, C. E. Nourse & Co. of Toronto, Canada, became the owners of said 4500 bushels of wheat by due indorsement of said bills of lading, and were the owners thereof at the time said wheat was damaged by the sinking of the canal boat 'A. J. Dean.'

C. E. Nourse & Co., had entered into a contract for insurance with the Sea Insurance Company, Limited, of which contract, Policy No. 5681 hereto annexed marked Exhibit A. is a true copy.

Said contract or policy of insurance was in full force and effect on January 23, 1903. A certificate of insurance, the original of which is hereto annexed marked Exhibit B., was issued on January 21, 1903, covering a shipment of which the 4500 bushels of wheat in question formed part.

The statement of the policy number as 5645 in the certificate Exhibit B. is an error, the true policy number being 5681, and Exhibit A. is the policy under which said certificate was issued.

On January 29, 1903, C. E. Nourse & Co. presented to the agents of the Sea Insurance Company, Limited, a statement of claim, which is annexed marked Exhibit C.

On February 6, 1903, C. E. Nourse & Co., received from the Sea Insurance Company, Limited, the sum of $3992.85 and gave the receipt marked Exhibit D. annexed hereto.

On November 19, 1903, C. E. Nourse & Co. duly executed and delivered to the libellant Herbert Bradley, the assignment marked Exhibit E. and annexed hereto.

The libellant brings this action for the benefit and at the expense of the Sea Insurance Company, Limited."

Exhibit A. was the ordinary form of a marine policy. It was numbered 5681 and, inter alia, contained this provision:

"It is also agreed, * * * that it is warranted by the assured that this insurance shall not inure directly or indirectly to the benefit of any carrier or other bailee by stipulation in bill of lading or otherwise; and that this Policy shall be null and void to the extent of any amount paid by or recoverable from any carrier or bailee."

Exhibit B. was a certificate of the Sea Insurance Company, Limited, as follows:

"This is to Certify, that on the 21st day of Jany., 1903, this Company insured under policy No. 5645, for C. A. Nourse & Co. the sum of Seven Thousand Dollars in gold, on 7890 Bushels of mixed Wheat Valued at sum insured shipped on board of the Prince Line (Trojan Prince) at and from New York, N. Y. to Leghorn, Italy, and it is hereby understood and agreed, that in the case of loss, such loss is payable to the Order of C. E. Nourse & Co., on surrender of this Certificate."

Exhibit C. showed the loss to amount to $3992.85.

Exhibit D. was a receipt in the following form:

"February 6th, 1903.

"Received from the Sea Insurance Company Ltd. Three thousand nine hundred and ninety-two and 85/100 Dollars as a loan without interest and repayable only to the extent of any net recovery we may make from the carriers, responsible for the loss on our grain damaged while on board the Lighter 'A. J. Dean' intended for the Steamer 'Tartar Prince' on or about January 23rd, 1903.
"$3992.85 C. E. Nourse & Co."

Exhibit E. was the assignment to the libellant mentioned above.

Testimony was taken, on behalf of the respondent, of several witnesses.

The master of the tug Mercedes, which towed the Dean from the terminus of the line of the respondent about 3 o'clock in the morning, testified that, in company with the boat Henry Igo, he towed the Dean to her destination at 42nd Street, where they arrived about 4:30 o'clock. The boats were towed alongside and projected some 12 or 15 feet ahead of the tug. The master also testified that it was then slack flood tide and ice was not moving, but there was some kept in the slip by a northwest wind. He pushed the boats a short distance in but the master of the Dean was not satisfied and the tug, at his instance, pushed the boat further in and she was made fast about half way up the slip. The master measured the water in her and told the tug's master that she was all right and the tug left.

The agent of the Providence & Washington Insurance Company, which had some insurance on the cargo, testified that the Dean had passed inspection to carry grain, although she was built, according to the records, in 1874 and rebuilt in 1888; that she had several hundred dollars spent in repairs upon her in 1893. She was not classed as 1st, 2nd, or 3rd, but as fit to carry this cargo.

The master of the boat could not be found and his protest was offered in evidence and received without objection. It was as follows:

"My Boat is a bin boat, I took on my cargo during the months of December and January, boat was in good condition when loaded. On the 23rd of January the tug 'Mercedes' of the Lehigh Valley R. R. Co. came to tow my boat to 42nd Street, South Brooklyn. There was considerable ice in the River; the tug had another boat called the 'Henry Igo.' Proceeded on our way and arrived at 42nd Street at five o'clock A. M. After our arrival the tug left me. I tried my pumps and found about 5 inches of water. I pumped her dry. I went down into the cabin and got my breakfast. After a short time I came on deck and found the boat had settled at the bow, and found about three to four feet of water. I called for assistance and the tug 'Mutual and Municipal' came and pumped my boat for about two hours,

but could not hold her, water came in so fast, and my boat sank at the dock. My boat did not leak prior to this, and held her cargo in good condition. This disaster was caused by ice making a hole in my boat."

A shipwright testified that he gave a small overhauling, as ordered by the owner, in 1892, to the extent of about $30.

The Inspector for the Providence & Washington Insurance Company testified that he had inspected the boat at different times and put her on the company's list as allowed to carry grain. That in his experience he had known new and sound boats to be sunk in going through the ice.

The master of the accompanying boat, the Henry Igo, testified that two hours after their arrival at 42nd Street, the Dean began to show signs of distress; that the slip was so full of ice, they retained their places without putting out lines; that he then notified the master of the Dean who had gone below to lie down, that she had about 4 inches of water in her, who replied that it was all right; that he then went to his breakfast and when he came out the Dean was still lower in the water and he again notified the master, who hustled around and secured the services of a tug to put a siphon in his boat but it did no good and she sank almost immediately.

The testimony seems to warrant the inference that the boat was seaworthy and sank through injury from the ice. The master said in his protest: "This disaster was caused by ice making a hole in my boat." There is nothing to overcome this statement and although it would have been more satisfactory if the master had been subjected to cross-examination, yet, as this was waived, it must be assumed, in connection with the other testimony of the respondent, to establish that the ice was the cause of the loss.

The libellant urges that any doubt in the case should be resolved against the boat (The Aggi [D. C.] 93 Fed. 484, 491), but I do not think there is any doubt upon the proof as it stands. At the least, there was general proof of seaworthiness and an adequate cause of loss being shown, it sufficiently meets any burden that there may be upon the carrier. The Sandfield (D. C.) 79 Fed. 371.

It is also urged that the respondent was negligent in causing the boat to be towed through the ice in the night time, citing The Rambler (D. C.) 66 Fed. 355, and the J. B. King Transportation Company v. Steamtug Phœnix, 143 Fed. 350. In the latter, several cases were referred to, tending to show that simply towing in ice is regarded as negligent, viz.: The Tugboat James A. Wright, 3 Ben. 248, Fed. Cas. No. 7,190; the Steamtug U. S. Grant, 7 Ben. 337, Fed. Cas. No. 16,804, cited by Coxe, J., in The M. J. Cummings (D. C.) 18 Fed. 178, 184. But it was held in the Transportation Company v. Phœnix, that half damages only were recoverable, because the towed boat participated in the risk. Here the boat was pushed into the ice in the slip at the express request of the master, so that if the tug were negligent, half damages could probably only be recovered in a case against her. The request of the master of the boat to be towed would not entirely relieve the tug from the effects of her own negligence. I feel constrained to

hold that pushing the boat into the ice in the slip, where there was probability of danger therefrom, constituted negligence on the tug's part.

The loss here apparently occurred through the negligence of the tug, notwithstanding the seaworthiness of the Dean, and there does not seem to be anything in the Harter Act which tends to exonerate her owner from liability therefor. The question as to the application of that statute to a case where both the tug and tow were owned or controlled by one person has not apparently been decided. It was raised in The Cygent, 126 Fed. 742, 61 C. C. A. 348, before the circuit court of appeals for the first circuit but it was there found unnecessary to decide the question. In The Nettie Quill (D. C.) 124 Fed. 667, a locomotive carried on a barge towed by that steamer was dumped overboard. There a bill of lading was issued by the steamboat and the court, Toulmin, J., decided that the contract was one of affreightment, rather than of towage, and the Harter Act applied, but there can be no question of the kind here as the relation of the tug was one of towage. Here there was no such connection between the tug and the wheat, as would bring the Act into operation. The relief afforded by the Act should not be unduly extended and in the absence of authority making it applicable to a case of this kind, I think that the owner of the tug should be held, unless some defense exists by reason of the insurance of the wheat.

The respondent relies upon the provision in the bill of lading, quoted in the agreement of facts (Libellant's Exhibit 1, supra), to the effect that in case of any loss or damage to goods for which the carrier may be able, it is agreed that the carrier shall be given the benefit of any insurance by or for account of the owner, but the policy of insurance provided (Exhibit A, supra), that such provision should be null and void so far as the carrier was concerned.

In any event, the provision relied upon does not amount to an agreement that the shipper shall insure for the carrier's benefit and any contract of that nature would not be enforceable if made (Inman v. South Carolina Railway Company, 129 U. S. 128, 139, 9 Sup. Ct. 249, 32 L. Ed. 612), and it has been decided that under a policy in this form, the assured cannot recover from his insurers when he has accepted a bill of lading by which he agrees to give the carrier the benefit of his insurance, if the loss is one for which the carrier would otherwise have been responsible (Inman v. Railway Co., 129 U. S. 140, 9 Sup. Ct. 249, 32 L. Ed. 612; Fayerweather v. Phenix Ins. Co., 118 N. Y. 324, 23 N. E. 192, 6 L. R. A. 805). It is contended, however, that the transactions between the cargo owners and their insurers subsequent to the loss, amount to a payment thereof and the insurers are thereby estopped from claiming the benefit of the warranty in the policy. It appears that the assured presented a claim to the underwriter and advanced such amount "as a loan," taking a receipt showing such fact. (See Exhibit D., supra.) This method of dealing has been authoritatively held not to constitute a payment. The Guiding Star (D. C.) 53 Fed. 936, 940; The Inman Case, supra;

Judd v. N. Y. & Texas S. S. Co., 117 Fed. 206, 213, 54 C. C. A. 238; Pennsylvania R. R. Co. v. Burr, 130 Fed. 847, 65 C. C. A. 331.

It seems that by·reason of the tug's negligence, the libellant is entitled to recover.

Decree for the libellant, with an order of reference.