## THE GLADIATOR.

### NEW BEDFORD STEAM COASTING CORP. v. NICKERSON.

(Circuit Court of Appeals, First Circuit. March 23, 1897.)

1. COLLISION — TUG AND TOWS IN NARROW CHANNEL — COLLISION WITH LIGHTSHIP.

A tug, with several tows on long hawsers, the whole fleet being about 2,490 feet long, bound from Boston to New York, held in fault in going to the northward of the Pollock Rip lightship, though this is the usual course of tugs with tows, where she was compelled to attempt a long swing of her tow under adverse wind and tide through a channel much narrower than the length of her tow, so that the last tow was brought in collision with the lightship, it appearing that there was abundant room and water for passing to the southward of the lightship. Held, further, that the tow was also in fault in failing to put her helm hard to port until within nearly a length from the lightship.

2. SAME — CONSEQUENCE OF COLLISION — BURDEN OF PROOF.

It is the duty of a vessel injured through the fault of another to use reasonable diligence to diminish the consequences of the injury; but the party in fault has the burden of showing that the actual results of his fault, as they in fact occurred, might have been diminished by such diligence. If it appear, however, that no efforts were made to mitigate the loss, when there was a reasonable probability that it might have been mitigated, this omission, under some circumstances, raises such a presumption as relieves the original wrongdoer from showing by strict proof that the ultimate result could in fact have been avoided.

Appeal from the District Court of the United States for the District of Massachusetts.

James E. Carpenter, Samuel Park, and Edward S. Dodge, for appellant.

Eugene P. Carver and Edward E. Blodgett, for appellee.

Before COLT and PUTNAM, Circuit Judges, and WEBB, District Judge.

PUTNAM, Circuit Judge.    This is a libel against the tug Gladiator for so negligently towing the schooner Florence Nowell that she collided with the Pollock Rip lightship.   The tow was made up at Boston, October 24, 1891, and was bound for New York.   It consisted of the barge L. B. Gilchrist, about 180 feet long, and light, the barge Charter Oak, about 168 feet long, and light, and the schooner, of 211 tons, and deeply laden, in the order named.   The whole fleet was about 2,490 feet in length.   The collision with the lightship occurred about half past 6 o'clock in the evening.   It is conceded that the tug had sufficient power.   She was running from 6 to 6½ knots.   It is also conceded by the libel that the night was clear.   There was a heavy northwest wind.   The answer of the tug says "the wind was stiff northwest, with quite a heavy sea running."   The northerly edge of the channel north of the lightship was marked by buoy No. 4, distant from the lightship, as the answer says, from one-quarter to three-eighths of a mile, and the tug proceeded with her tow through this channel.   There is a dispute as to the direction of the set of the tide, which was running quite strong.    Allen, the captain of the lightship, says it was westsouthwest.    However it was, the lightship headed northeast, tailing southwest, and the combined effect of the tide and wind, under the maneuvers of the tug, tended to set the schooner strongly towards the lightship. The last buoy passed by the tug and tow on their starboard, before reaching buoy No. 4, was buoy No. 2, about half a mile from No. 4, in a northeasterly direction.   The tug, at No. 2 buoy, changed her course from southwest by south to westsouthwest, and at No. 4 to northwest by west,—eight points in all.   Though the turn was said to have been a gradual one, yet the result was an attempted long swing of a tow over which the tug had little control, under adverse wind and tide, through a channel of much less width than the length of the tow.   Consequently, while the tug hugged buoy No. 4 closely, and ran, as her captain says, within 150 feet of it, the Charter Oak, according to the testimony of her master, ran within her own length of the lightship, and the schooner came into collision with it.   It is admitted that there were abundant sea room and water south of the lightship.   It is also shown that tows usually pass north of it, and the testimony is that it is safe to do so.   This is undoubtedly all true under ordinary circumstances, and it is also true that we must regard the usages of navigation, as was said by us in The Berkshire, 21 C. C. A. 169, 74 Fed. 906, 910; but, as applied to the facts and peculiar conditions of this case, the attempt to pass to the north of the lightship was, it is clear, extremely hazardous.   And, as there was no emergency requiring it, the tug was in fault on this account, as was determined by the district court.   While, as said in The Berkshire, we cannot condemn a tow of the character of that in this case as absolutely unlawful, yet we must hold tugs which navigate this coast with

such long and essentially hazardous fleets to the use of the extremest care in the interests of common safety. But the conditions were apparent to the master of the schooner, and he must have perceived that they required great vigilance from him, especially in keeping under a port helm, and that they forbade the omission of any effort to prevent injurious results from the error of the tug. We think he failed in this respect. The preponderance of the evidence shows clearly that he did not put his helm hard to port till he was within about the length of his vessel from the lightship. That he had steerageway is apparent, because it is plain from the evidence of the captain of the lightship that the schooner commenced to swing to starboard so soon as her wheel was put hard to port. It therefore follows that, though the position was hazardous, vigilant action on the part of the schooner, her officers and crew, would probably have averted any collision.

The schooner sunk after the collision, and became a total loss. It is claimed by the tug that this could have been prevented by reasonable efforts on the part of her officers and crew. It is plain, however, that, except for some intercepting cause, she would have sunk as the result of the collision, and that in fact her total loss was the physical consequence thereof. Under these circumstances, the collision must answer for the entire loss unless reasonable diligence would have prevented or diminished it. The general rule is stated in The Baltimore, 8 Wall. 377, 387, as follows:

"Persons injured in their property by collision are entitled to full indemnity for their loss, but the respondents are not liable for such damages as might have been reasonably avoided by the exercise of ordinary skill and diligence, after the collision, on the part of those in charge of the injured ship."

This rule does not seem to be questioned, but the parties are apparently at issue with reference to the burden of proof in regard to the claim that the schooner might have been saved. Expressions of the admiralty courts are cited as bearing on this issue, which, apparently, are not in all respects consistent with each other. We perceive no difficulty on this point. These varying expressions arise mainly in the application of the law to peculiar states of facts, by courts who do not hold so strictly to the technical rules relating to the burden of proof as those of the common law. Notwithstanding such expressions, the general rule of law remains everywhere to the effect that it is always the duty of a party injured to use reasonable diligence to diminish the consequences of the injury, and that it remains with the party in fault to show that the actual results of his fault, as they in fact occurred, might have been diminished by such use. The common law is so stated by Sedg. Meas. Dam. (8th Ed.) § 227, and the same rule is given as that of the admiralty courts in Mars. Mar. Coll. p. 112, as follows:

"Where the ship is damaged, but not sunk, in the collision, and she afterwards receives further injury, or is totally lost, the presumption ordinarily is that the subsequent injury or loss was caused by the defendant's negligence, and the burden is upon the wrongdoer in the collision to prove that it was not so caused."

It is nevertheless true that a presumption of fact sometimes arises against an injured person who makes no effort to diminish the effects

of the tort.   This, for very apparent reasons, is emphatically so with reference to maritime disasters; so that, if no efforts are made to mitigate a loss where there is a reasonable probability that it might have been mitigated, this omission, under some circumstances, raises such a presumption as relieves the original tort-feasor from showing by strict proof that the ultimate result could, in fact, have been avoided. There is much in the circumstances of this case calling for the application of this presumption; but the Gladiator was a powerful coast tug, with all the appliances and crew which the expression implies. She was inexcusable if she did not have them, and did not use them for the relief of the schooner so far as it was practicable to do so.   Yet she voluntarily abstained from doing anything, or else was unable to save the schooner.   It may be that, in view of the age of the Florence Nowell and of the character of her cargo, and of the locality, and of the consequently probable disproportionate cost of beaching, discharging, and repairing, the salvage would necessarily have been so small as not to have justified the apparent exertions and hazards involved in saving her.   We must also consider that, in view of the circumstances we have just stated, the tug may have foreseen the chances that, under the rule, "Restitutio in integrum," with no allowance on account of new for old, and with the considerable demurrage which might ensue, and with, also, the probability of a substantial total loss of the cargo of paving stone with which the Florence Nowell was laden, the pecuniary loss to the tug might have been greater if the schooner had been beached than if she sunk.   Therefore, while, of course, we do not say that it was impossible to accomplish the rescue of the Florence Nowell, and rarely could say this under like circumstances, yet, on the whole, we must, according to the well-settled rules applicable to maritime emergencies presenting sudden and difficult conditions, accept the practical judgment rendered on the spot by those who were there, as shown by what was in fact done or not done.

The Gladiator claims that the Florence Nowell was unseaworthy for the voyage from Boston to New York.   There is ground for holding that the Gladiator was chargeable with knowledge of this, and that she understood that it was on this account that the schooner asked a tow.   However, even if this contributed to the result, it is enough to say that it did not relieve the tug from her obligation to exercise proper care and skill, nor excuse her for running north of the lightship, and its consequences are covered by the fact that the schooner is required, by reason of her fault in other respects, to share the loss.   The decree of the district court is reversed, and the case is remanded to that court, with directions to proceed on the theory that both vessels were in fault; and the appellant is adjudged the costs of appeal.