THE BRONX.

SMITH et al. v. THE BRONX.

(District Court, D. Massachusetts. March 23, 1898.)

1. BURDEN OF PROOF—PRESUMPTION OF FACT.

The burden of proving that the damages to be recovered were caused by the wrongdoing of the offending vessel remains on the libelant, and does not shift during the trial; but the introduction of evidence may give rise to a presumption of fact, and thus put upon a party the burden of explaining a situation from which, in the absence of explanation, his liability would be presumed.

2. MEASURE OF DAMAGES—REFUSAL OF MASTER OF STRANDED VESSEL TO ACCEPT ASSISTANCE.

Where those in charge of a stranded vessel refuse the services of tugs belonging to the owner of the vessel responsible for the accident, tendered promptly, while the tide was high and conditions favorable, and it appears that the stranded vessel could have been saved at that time with less cost than that afterwards incurred by libelant, he will be limited to such damages as the schooner and cargo would have sustained if hauled off the beach at time of claimant's offer.

This was a libel in admiralty by John L. Smith and others against the steam tug Bronx to recover damages for the stranding of libelants' schooner Hooper, while in tow of the Bronx. The cause was heard on exceptions to the assessor's report in respect to the damages.

The schooner Hooper went ashore on Plum Island a little after high water, on the evening of July 4th. The accident happened through the fault of the tug Bronx, which had undertaken to tow her into Newburyport. On the following morning, the master of the schooner, Joseph E. James, who, with his crew, had

spent the night at the life saving station, went on board the schooner before breakfast, and made some examination of her condition, after which he went up to Newburyport, and there noted a protest. He left the vessel meanwhile in charge of the mate, William E. Corson. During his absence, at about 8 a. m., two tug boats belonging to the Merrimac River Towing Company, owner and claimant of the Bronx in this case, arrived at the beach. They were the Uhler, a tug boat of 165-horse power, and the Hazel Dell, of 140 horse power. The Bronx (140 horse power) was also in readiness if wanted. The two boats first mentioned had come from Newburyport, under the command of the manager of the company, Capt. Davis, to see what could be done about pulling the schooner off. He had with him two pilots, duly qualified to pilot vessels into the harbor, and a proper complement of men. After arriving at the schooner and examining her situation, he went ashore, and made arrangements with members of the life saving crew and others on the beach to take the life boat, which was there and ready for use, and run a line from the schooner to the tugs for the purpose of pulling on her. This was about to be done when a conversation occurred between the mate, Corson, then in charge of the schooner, and Capt. Davis, regarding the terms on which the proposed effort should be made. Capt. Davis' proposition was that the whole matter of compensation should be left for settlement afterwards. The mate insisted that there should be a written agreement in advance, either that nothing whatever should be charged unless the schooner was taken off, or that the amount to be charged should in no event exceed a certain sum; and, failing to induce Capt. Davis to make any such agreement, he forbade the line to be run from the schooner to the tugs. They thereupon returned to Newburyport, Capt. Davis leaving word for the captain with the mate that he had been there with two boats ready to pull the schooner off, that he should be at the office in Newburyport all day, and could be found there if wanted. Before the tugs started from the beach, however, and about 10 o'clock, Capt. James arrived back from Newburyport. He saw the tugs there, and heard from the mate an account of what had passed, but took no steps whatever then or afterwards to communicate with Capt. Davis or get him to continue his effort to relieve the schooner; and that same afternoon he began to strip her. On the morning in question, the tide was high a few minutes after 10 o'clock, the weather was fine, the wind off shore, and the sea smooth. Capt. Davis and his tugs were at the schooner early enough to take advantage of the high tide in their proposed attempt to get the schooner off. The tides on the next and subsequent days were less favorable for the attempt, as the tides were "medium" between July 1st and 12th, and, "low" July 13th–17th.

Carver & Blodgett, for libelants.
Russell & Russell, for respondents.

LOWELL, District Judge. The interlocutory decree of Judge NELSON must be taken to establish that the Hooper went ashore on Plum Island by the fault of the Bronx. The owners of the Hooper expended certain sums of money in floating the schooner with its cargo, and the schooner, after she had been floated, was found to have sustained damage, the cost of repairing which has been found by the assessor. The amount of these items, and of certain others which need not be here mentioned, the owners of the Hooper seek to recover from the Bronx in this action. The owners of the Bronx, admitting that the interlocutory decree makes the tug liable for the damage caused by the stranding of the Hooper, yet object to pay the expenses of getting her off, on the ground that they themselves could and would have floated her and towed her into the harbor of Newburyport for nothing if they had not been hindered by those who had charge of her.

The principles of law applicable to this branch of the case are simple, and the only difficulty lies in their application. The libel alleges, as it must, that the damages which the libelant seeks to recover were caused by the fault of the vessel libeled. The burden of proving this, to wit, that the injuries and expenditure for which he seeks to recover were the result of the tug's wrongdoing, or, what is the same thing in this case, the result of the stranding of the schooner, is on the libelant. This burden of proof, in its technical sense, here remains on the libelant throughout the case, and never shifts. But where a vessel has come into an exposed and dangerous position by the fault of another, and is rescued from that position at a certain cost, then, in the absence of other evidence, it may often be reasonably presumed that the cost of relief is the true measure of damages. In the case at bar, if there were no evidence of what occurred after the stranding, except evidence of the cost of hauling off the schooner by the Right Arm, I might fairly presume that this cost should be reimbursed by the Bronx. This would be a "prima facie presumption" (3 W. Rob. 13); a presumption of fact, which is sometimes said to shift the burden of evidence, though not the technical burden of proof; by putting upon the party against whom the presumption is made the burden of explaining a situation from which, in the absence of explanation, his responsibility would naturally be inferred. These presumptions and this burden of evidence may shift frequently, as the facts are developed by the evidence in the course of a trial. As was said in The Gladiator, 25 C. C. A. 32, 79 Fed. 445, 447, the expressions of admiralty courts upon this matter seem in some respects inconsistent; but these varying expressions arise in the application of the law to peculiar states of fact. The opinion of the court in that case goes on to illustrate how, under some circumstances, as evidence is introduced, a presumption of fact, and with it the burden of introducing further evidence to qualify facts already proved, may shift from side to side. Another illustration of the difference between the burden of proof, properly so called, and a presumption of the sort just mentioned, is found in the case of Grill v. Collier Co., L. R. 1 C. P. 600, 612, 614; s. c., on appeal, L. R. 3 C. P. 476, 482. In that case, as in this, the question to be determined was this: Was the damage to the plaintiff's property (in that case the cargo of a vessel which had been in collision) occasioned by the defendant's negligence? The judge left it to the jury to say whether the collision was caused by the defendant's negligence. Defendant contended that the judge should have asked the jury if the damage to the plaintiff's property was caused by the defendant's negligence, and urged that the damage might have been lessened by proper precautions taken after the collision. The court said that this objection might prevail if there were any facts to support it, but that it was a mere speculation of counsel, and that there was no evidence that the damage could have been lessened. Under these circumstances, it was held that the ruling of the judge at the trial was substantially correct, although he had not stated the question to the jury with logical exactness. It was a fail-

ure to appreciate this difference between the burden of proof, properly so called, and a presumption of fact, which, as I conceive, led Sir Robert Phillimore, in The Thuringia, 1 Asp. 283, 291, 292, to say:

"It appears to me that the decisions of common law incline to the position that the burden of proving that ordinary skill and courage could not have averted the loss lies upon the party complaining." "The decisions in this court, however, seem to throw the burden of proof upon the original wrongdoer, who alleges that the injured vessel was unnecessarily abandoned."

In order to rebut the presumption that the cost of floating the schooner was an expense reasonably incurred by the libelant in extricating his property from the plight into which it had fallen by the fault of the Bronx, the claimants show that, on the morning after the stranding, they sought to carry a hawser from the Hooper to two or more of their tugs, intending to haul the schooner off the beach at high water. This intention of the claimants was frustrated by those in charge of the Hooper. In refusing to allow the claimants to attempt the rescue of the Hooper, I think the mate of the schooner, and the captain, so far as he was responsible for the refusal, acted very unwisely. It was at least possible that the attempt would succeed. If it failed, no harm would have been done. The first high tide after a vessel has gone ashore is certainly the natural time for an attempt to get her off, and, if those in charge of the schooner neglected to avail themselves of an opportunity which offered at the least a reasonable chance of success, they cannot be heard to say that their neglect occurred in the exercise of a reasonable discretion.

It is urged by the libelant that the court does not scrutinize carefully what is done in good faith and in a time of perplexity by those in charge of a vessel, but often treats conduct as reasonable and proper even though it has resulted in damage to the property concerned. That this will be done in some cases there can be no doubt; but I consider that the mate's action in refusing the aid of the tugs was so unreasonable as to put it outside the scope of the rule. As was observed by the privy council in the case of The Flying Fish, Brown. & L. 436, 443, the test is "what a reasonable man would do under similar circumstances where he had no other judgment but his own to resort to." "It is to be observed," the court there remarked, "that this was not the case of a sudden emergency, leaving no time for deliberation, when great allowances should be made for any error in judgment which may occur. In this case there was no danger to life, nor any immediate apprehension of the loss of the vessel; and the captain had some hours to decide what course was best to be adopted. The learned judge was of opinion that 'as against a wrongdoer, which,' he says, 'in legal estimation, the Flying Fish must be taken to have been, it cannot be maintained that there was no reasonable doubt as to the course to be pursued.' But treating the Flying Fish as a wrongdoer is really begging the whole question. For the collision, and for all the consequences of that collision, the appellant is responsible. But if the subsequent

damage resulted from the acts or omissions of the captain of the Willem Eduard, for that portion of the damage the appellant is not only not a wrongdoer, but he is not even to be regarded as the doer of the act which occasioned it." "It is impossible for their lordships to arrive at the conclusion that the master exercised any judgment at all upon the possibility of saving his vessel. It appears that he attempted nothing, because he had persuaded himself that nothing could be done; and that he rejected all offers of assistance, not after weighing the measures proposed, but because he had hastily determined that the state of his vessel would make every effort to save her unavailable." See, also, The Baltimore, 8 Wall. 377, 387; The Linda, Swab. 306; The Thuringia, 1 Asp. 283; The Eolides, 3 Hagg. Adm. 367; The Hansa, 6 Asp. 268.

It is further urged by the libelants that the action of the mate, who had limited authority, may not bind the libelants so completely as the action of the master would have done; but the evidence shows pretty clearly that, when the master arrived on the beach, he did not, as he might have done, recall in any way the refusal given by the mate, nor did he express any willingness that the claimants should make the attempt they proposed. I think, moreover, that, unless the master was able to rely altogether upon his mate's discretion, he did a very unwise thing in absenting himself from the beach at that time. He knew that the tide would be high about 10 o'clock. The weather was most favorable, and he should certainly have been on hand at some time before high water to avail himself of all the opportunities that might offer. He had already notified his owners, and, if his protest could not have been made at an earlier hour, it might well have waited until the tide had fallen.

It is further urged by the respondents that, in order to make it the duty of the mate and the captain to accept the claimants' offer, the latter should have offered the services of their tugs without compensation. The argument seems to me to overlook the situation of the parties at the time. The schooner had gone upon the beach. There was little doubt that its owners would seek to hold the Bronx responsible for the damage. The interlocutory decree of Judge NELSON had not then been rendered. Had the owners of the tug offered their gratuitous services to the schooner, their action would naturally have been construed as an acknowledgment that the Bronx was to blame for the original accident, and this acknowledgment the claimants could not afford to make. They offered no bargain, but, as I read the evidence, said in substance this: "We will try to float the schooner without prejudice, without a previous agreement, and with the compensation, if any, left to the discretion of the court." This court can hardly be expected to admit that its own discretion is exercised so unreasonably as to make it a terror to reasonable men. I am of opinion, therefore, that those in charge of the schooner should have permitted the claimants to attempt to get her off the beach at high water on the morning

of July 5th, and that, in refusing to permit the attempt, they acted unreasonably, even after allowance has been made for the difficulties of their situation.

Unreasonable as the conduct of those in charge of the schooner may have been, it cannot, however, defeat the right of the libelants to recover, unless the refusal caused additional delay and expense. Though it may have been the duty of the mate to permit the claimants to make their attempt, his refusal caused them no injury, unless their attempt would have succeeded. I consider the principal question involved in this case to be: Could the claimants, with the force at their disposal, have hauled the schooner off the beach at high water on the morning of July 5th? It is not important to determine whether, after proof of the claimants' unreasonable refusal, there was, in the absence of other evidence, a presumption of fact that the schooner could or could not have been pulled off. Had neither party introduced evidence, I might have had to decide in whose favor the presumption existed. But as all available evidence was introduced, I have only to determine to which side the weight of evidence inclines.

As no attempt was made to float the vessel, the possibility of floating her is a matter of opinion, and the opinions of the witnesses differ widely. I have come to the conclusion that the attempt would probably have been successful. Most of the witnesses were prejudiced. Many of them had no particular capacity for forming a valuable opinion. Davis, Kenney, and Pettingill, who knew something about wrecking, were undoubtedly prejudiced in favor of the claimants' case. Lattime and McBurnie were without considerable experience. In reaching my opinion, I am chiefly moved by the evidence of Capt. Davis, of the Right Arm, who finally pulled off the Hooper, and who, so far as appears, was an unprejudiced observer, as well as an expert wrecker. His testimony seems to me to show that he believed that the claimants would have succeeded. Some of the reasons he gives for his belief may not be weighty, but his conclusions are more important than his reasons. The opinion of an expert who is competent and impartial is not to be discredited by his scant training in logical expression. I am moved also by the fact that the experienced assessor, who had the great advantage of hearing all or nearly all the witnesses, reached the conclusion to which I also have come. While I have thus come to the conclusion that the Hazel Dell and the Uhler could have pulled off the schooner on the morning of July 5th, I think, if it be necessary to their case, that the claimants are entitled to add the power of the Bronx to that of the two other tugs. She was in Newburyport at the time, and was available. It is true that this fact was unknown to those in charge of the schooner, and, in determining if their action in refusing assistance was wise or unwise, only the two tugs can be taken into consideration. If I am right, however, in holding that those in charge of the schooner should have accepted the offer, though made by only two tugs, I think that, in determining the question of ultimate success,

I am not prevented from considering the facts as they actually existed. I agree with the assessor, therefore, that the Bronx was responsible only for the damage which the schooner would have sustained if she had been hauled off the beach on the morning of July 5th; and I overrule the libelant's exceptions to that part of the assessor's findings.

The libelant's exception E relates to the liability of the tug for damages sustained by the schooner's cargo. Had the schooner been floated on the morning of July 5th, the cargo would not have been injured.

Exception M relates to the disallowance of the expenses of Mr. Champion's first trip. Exception N relates to the amount of demurrage. I am not disposed to differ from the findings and rulings of the assessor upon these points.

Regarding exception T, I agree with the assessor that, if the claimants had performed salvage service, they would so far have satisfied their own liability by services instead of money; and I see no reason why the libelants should recover an amount which, under the circumstances, they would not have been called upon to pay. It is said that while the owners of the tug might have been prevented from recovering for the salvage services rendered by their vessels, because they were liable for the original disaster, yet that the officers and crew of the tug might have recovered from the schooner the value of their own individual salvage services. Had they done so, the owners of the schooner could doubtless have claimed reimbursement from the owners of the tugs, but I think a hypothetical expense of that sort cannot be recovered in this action.

Holding the above opinion, I need not consider the respondents' exceptions. Decree in accordance with the assessor's report.