THE MURRELL.

(District Court, D. Massachusetts. January 10, 1911.)

No. 241.

1. SHIPPING (§ 136*)—LOSS OF CARGO OF TOW—HARTER ACT.
 Harter Act Feb. 13, 1893, c. 105, § 3, 27 Stat. 445 (U. S. Comp. St. 1901, p. 2946), providing that, if the owner of a vessel shall exercise due diligence to make her seaworthy and properly manned, equipped, and sup-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

plied, neither he nor the vessel shall be liable for damage or loss resulting from faults or errors in navigation or in the management of said vessel, applies only to the relation between a vessel and the cargo with which she is herself laden, and does not relieve the owner of a tug from liability for its negligence in towing a barge, because the barge is under charter to him and he is in fact the carrier of her cargo.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. § 136.*]

2. TOWAGE (§ 11*)—LOSS OF TOW—LIABILITY OF TUG.

A tug, with two laden coal barges in tow, on hawsers which made the entire tow nearly half a mile long, in passing around Cape Cod undertook to go through Pollock Rip Slue, in which the rear barge grounded and was so injured that she sank. The route through the Slue, while saving a distance of 17 miles, was dangerous for vessels of the draft of the barge, which was greater than that of the other two vessels, owing to the narrowness and shifting character of the channel. *Held*, that if the barge followed in the wake of the tug, as the evidence showed she did, the fact of her stranding raised a presumption of fault on the part of the tug, and that the evidence did not overcome such presumption, but tended to show that on the course taken by her there was not sufficient depth of water for the barge.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

3. TOWAGE (§ 11*)—LOSS OF TOW—LIABILITY OF TUG.

A short time before the stranding the shoal to the east had extended westward into the channel, and a buoy had been placed 1,200 feet to the westward of those marking the east side of the channel, and notice given and published to mariners that vessels of deep draft should pass to the westward of such buoy. There was evidence tending to show that the buoy was not in place at the time of the stranding. Although notices of changes in the channel had repeatedly been published during several months, and the fact was generally known to navigators, the master of the tug had no knowledge of it and passed so far to the eastward that apparently the depth of water was not sufficient for the barge, which caused the stranding. *Held* that, under the rule that a tug is bound to know the nature of the ground and depth of water as regards her tow, and to exercise a proportionately higher degree of care and skill in localities more than usually dangerous, as this was, the ignorance of the master did not exonerate the tug from liability.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

4. SHIPPING (§ 208*)—LIMITATION OF LIABILITY—PRIVITY AND KNOWLEDGE OF SHIPOWNER.

That the master of a tug, with a good record of 14 years as a master, was ignorant of a particular danger which caused the loss of a tow, and of which he was legally bound to know, does not establish his incompetency in such sense as to charge the owner with privity and knowledge because of his employment, which will deprive such owner of the right to a limitation of liability for the loss.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 645; Dec. Dig. § 208.*

Limitation of owner's liability, see note to The Longfellow, 45 C. C. A. 387.]

5. SHIPPING (§ 136*)—LOSS OF CARGO OF TOW—HARTER ACT—"ENGAGED IN TRANSPORTING MERCHANDISE OR PROPERTY."

A tug engaged in towage, the tug and tow belonging to distinct owners, having with each other only the relation arising under an ordinary contract for safe towage, is not within the Harter Act, providing certain

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

exemptions for vessels "engaged in transporting merchandise or property."

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 492; Dec. Dig. § 136.*]

In Admiralty. Petition for limitation of liability by the Baltimore & Boston Barge Company, as owner of the steam tug Murrell. Decree for damages in favor of Eastern Coal Company and Austin Gove & Son, owners, respectively, of the barge West Virginia and her cargo, and granting limitation of liability.

For opinion on appeal, see 195 Fed. 483. See, also, 188 Fed. 727.

Frederic Cunningham, of Boston, Mass., for petitioners.

Blodgett, Jones & Burnham, of Boston, Mass., for damage claimants.

DODGE, District Judge. The petitioner's tug Murrell undertook to tow the barge West Virginia, laden with 2,100 tons of coal, from Newport News to Boston. Another barge, called the Ivie, was taken in tow on the same trip, and was towed next after the tug; the West Virginia being the last barge in the tow. During the voyage, while the tug and barges were proceeding in the order stated through Pollock Rip Slue, the West Virginia grounded and parted the hawser wherewith she was being towed. Whether it parted before or after the barge grounded is in dispute. The tug afterward towed the barge afloat, but she was found to be leaking so fast that she could not be kept afloat, and she sank in deep water, with her cargo on board, about three hours later. The barge belonged to the Eastern Coal Company, and her cargo to Austin Gove & Son, of Boston, who claim damages for their loss. The petitioner has denied that it or the tug is liable for these damages, because not caused by any fault of the tug. This hearing has been upon the question of the tug's liability, and also upon the question whether, if liable, the facts charge the petitioner with privity or knowledge, so as to render it incapable of limiting its liability.

[1] 1. The petition alleges, and the answer thereto admits, that the barge was under charter to the petitioner at the time of the accident. According to the evidence, the petitioner had subchartered her for this voyage. The charter party from her owner to the petitioner bound her owner to keep her manned, to keep her seaworthy, and to furnish the hawser used in towing her. The petitioner contends that it was engaged in "transporting merchandise or property" between ports of the United States; that there is no question as to its exercise of due diligence to make the tug in all respects seaworthy, and to man, equip, and supply her properly, nor any question that the barge was also seaworthy, properly manned, equipped, and supplied; and that it is therefore exempted from all responsibility for the damage or loss now claimed, even if resulting from faults or errors in navigation or in the management of the tug or barge, by the provisions of the Harter Act (27 Stats. 445). The damage claimants contend that the Harter Act has no application, except as between the owner of cargo and the owner of the vessel carrying it on board.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

I consider the affirmative evidence sufficient to show that the petitioner used due diligence to make its tug seaworthy, and to man, equip, and supply her properly at the beginning of the voyage. As to the barge, however, it appears to have relied upon the undertakings of her owner, in the charter party, so far as these matters were concerned. Before it can claim the benefit of the Harter Act, on the ground that it controlled both tug and barge, and ought not, therefore, to be regarded as performing a towage contract, but rather as transporting both the barge and her cargo as merchandise or property, affirmative proof of its own due diligence regarding barge as well as tug would seem to be necessary, at least as regards the owner of the cargo, an entire stranger to the charter party. Neither inference nor presumption can supply the place of affirmative proof of the due diligence required by the Harter Act. The Wildcroft, 201 U. S. 378, 26 Sup. Ct. 467, 50 L. Ed. 794. But this principle can hardly oblige the court to insist on affirmative proof of what is admitted, and in this case the owner of the cargo and the owner of the barge as well have not only admitted, but have affirmatively alleged in their answer and claim (article 10o), that the barge was "tight, staunch, and strong, well manned and equipped, and in all respects fitted and suited for the voyage"; also that her master was "a careful and competent navigator." I think the finding justified that the petitioner exercised that diligence in regard to the tug and barge which the Harter Act requires as the condition of the exemption from liability which it grants, supposing the act to be otherwise applicable. The question then presented is: May an owner of a tug have the benefit of the act, as against damage through negligence on the part of his tug, in towing a barge under charter to him, loaded with a cargo which he, thus controlling the barge, has agreed to carry in her?

[5] That the Harter Act has no application to neglect towage when tug and tow belong to distinct owners, having with each other only the relations arising under an ordinary contract for safe towage, I shall take for granted. To say that the owner of the tug, in such a case, is "engaged in transporting merchandise or property," is to extend those words of the Harter Act so as to make them include what Congress never intended them to include. If this is not obviously true, I must regard it as beyond question since the decision in The Delaware, 161 U. S. 459, 471, 16 Sup. Ct. 516, 522 (40 L. Ed. 771). In holding that the act could not exempt the owner of one vessel from liability for damage negligently inflicted by collision upon another, the Supreme Court said:

"It is entirely clear that the whole object of the act is to modify the relations previously existing between a vessel and her cargo."

There is nothing in an agreement by the owner of a tug to tow another owner's vessel which can be regarded as making the latter vessel or her cargo the cargo of the tug. The only case wherein the Harter Act has been allowed any application in a case of towage is The Nettie Quill (D. C.) 124 Fed. 667. The District Court for the Southern District of Alabama held that the owner of a steamer making regular trips, which had agreed to transport a locomotive, and

had given a bill of lading for it in the usual form, and was undertaking to carry it, not on board the steamer, but on a barge belonging to the locomotive's owner, towed alongside, which barge was also covered by the bill of lading given, had made a contract, not of towage, but of affreightment, and that the contract was subject to the Harter Act. Calling the contract one of affreightment afforded reason for calling the locomotive cargo, though not actually laden on board the steamer.

The applicability of the Harter Act, when tug and tow belong to or are controlled by the same owner, so that the liability of the owner of the tug to the owner of the vessel towed, or to the owner of her cargo, differs in character from the liability which would arise under an ordinary contract for towage, has been considered, but not decided, by the Court of Appeals for this Circuit in The Cygnet, 126 Fed. 742, 61 C. C. A. 348. There the tug had been chartered to the owner of the barge she was towing, who equipped and manned her, appointed her officers, and was owner of her pro hac vice for the purposes of the case. There was negligence on the tug's part. Her registered owners were petitioning for limitation of liability and for exemption from liability under the Harter Act. Regarding that act the court said that many of its expressions limit it to the relation between a vessel and her cargo, and that its scope had been held generally to be so limited, but it was said further:

"Yet whether this limitation goes so far as to apply the statute exclusively to cargo actually laden aboard the specific vessel in fault, or whether it reaches a case like that at bar, where there is a common enterprise, both tug and tow belonging to the same owner, who is the carrier, and the cargo laden aboard the tow by the carrier, has not been authoritatively determined."

In a later case in the Southern district of New York, where a libel in personam was brought by the owner of a cargo lost on board a canal boat, sunk by negligence of the tug which had it in tow, the tug and the canal boat were both owned and controlled by the respondent. Bradley v. Lehigh Valley R. R. Co. (D. C.) 145 Fed. 569. The court referred to the two decisions last above cited, and said that there could be no question of the kind in the case before it, as the relation of the tug was one of towage. It said:

"Here there was no such connection between the tug and the wheat as would bring the act into operation. The relief afforded by the act should not be unduly extended, and in the absence of authority making it applicable to a case of this kind, I think that the owner of the tug should be held, unless some defense exists by reason of the insurance of the wheat."

In the same case on appeal, the Court of Appeals refused to give the Harter Act any application, because due diligence on the part of the defendant as owner of the barge had not been shown. The general question of the applicability of the act was not discussed.

The petitioner's control of the barge under the subcharter referred to made it the carrier of the barge's cargo, and created the relation of carrier and shipper between it and the owner of that cargo, now claiming damages for the loss thereof. The petitioner contends that the existence of this relation is enough to make the Harter Act applica-

ble as between it and the cargo owner, and thereby relieve it (its due diligence being established as above) from all responsibility for damage or loss to the cargo due to faults or errors in navigation or management of either vessel participating in the transportation, whether actually having the cargo on board or not. With this contention I am unable to agree, for the reasons below stated.

So far as their language merely is concerned, it may be that the provisions of the Harter Act can be made to include all liabilities of the vessel owner, as carrier, to shippers, for damage from the faults or errors mentioned, whether he is transporting the goods damaged on board the vessel chargeable with the faults or errors in question or on another vessel. The same provisions can in like manner be made to include liabilities to other vessels for damage from such faults or errors. But the construction adopted in The Delaware, already referred to, that the act deals only with the relations between "the vessel and her cargo," excludes both the above possible constructions, and seems to me in no respect a narrower construction than necessarily results from the court's discussion of the general tenor and provisions of the act, its history, and the exigencies which led to its enactment. 161 U. S. 470-474, 16 Sup. Ct. 516, 40 L. Ed. 771. By that construction I must be bound for the purposes of this case.

The petitioner, as has appeared, was using two vessels in the transportation of the barge's cargo—one of them the barge upon which the coal was laden, and whose cargo it was in the ordinary sense; the other the tug, which furnished the motive power and controlled the general direction, not only for the barge, but for another vessel not brought into this case. If, as the Supreme Court has said, the Harter Act has no other object than to modify the relations previously existing between a vessel and her cargo, it is necessary, in order to apply it in this case, to find some sense in which the cargo of the barge can properly be called the cargo of the tug. There is no more reason for saying that the West Virginia's cargo may be called the cargo of the tug than for saying that the cargo of the other barge might be so described. Neither barge was being towed alongside the tug. Neither the subcharter of the barge nor the bill of lading given for the coal on board her has been offered in evidence, and it does not appear that either of them refers to this or any particular tug as having any connection with the contract for transportation made with the owner of the coal. To that contract the owner of the tug may indeed have been one of the parties, but there is nothing to show that anything to be done by this particular tug was contracted for. If the mutual obligations between cargo and carrying vessel could ever have arisen between the tug and the cargo here in question, they could only have arisen from the fact that the tug was actually towing the barge containing the cargo, and they could have had no existence before such actual towage began. No reason whatever appears for calling the coal on board the barge cargo of the tug until the barge was taken in tow. Before that time there was no reason whatever for calling it the cargo of any other vessel than the barge. The petitioner's contention thus requires it to be regarded as at one time the cargo of the barge only, and at a later

time the cargo of the tug as well, there being also at that time another cargo with an equal claim to be regarded as the tug's cargo. It is difficult to believe that a construction of the Harter Act which involves results of this kind could have been intended by Congress. Moreover, while it is true that the tug was taking part in the transportation of the cargo, and that tug and tow, even when not made fast alongside each other, are to be regarded as one vessel for many purposes, so to regard them in this case, in order to call cargo on board the barge cargo of the tug, and thus bring the case under the Harter Act, is to permit the petitioner to treat both vessels as one in a proceeding instituted by him on the theory that they are distinct and independent. If this cargo is to be regarded as the tug's cargo and the tug's contract one of affreightment, as in The Nettie Quill, because both vessels are one as regards the cargo, justice would seem to require that both vessels should be liable for the fault of either, and that both should be surrendered in order to limit the liability to the cargo owner incurred by the negligence of either. This petitioner surrenders the tug only, and it sets up negligence on the part of the barge as an independent vessel. Either it has no right under section 4286, Rev. Stats., to limit its liability as charterer of the barge, or it does not choose to avail itself of that right. In either case its claim to limitation of liability is made upon the assumption that tug and barge were not one vessel, but were distinct. My ruling must be that no right to exemption from liability under the Harter Act has been established.

[2] 2. Does the evidence charge the tug with liability for the loss of this barge and its cargo?

The barge grounded and was lost on Wednesday, September 29, 1909. Early in the morning of that day the tug started from Vineyard Haven with the barges, to tow them over Nantucket Shoals and around Cape Cod. The selection of the course to be followed lay wholly with the tug. The shortest course was the one she selected, through Pollock Rip Slue. The only alternative was to head S. of E., instead of N. of E., at Handkerchief Lightship, and take from there a longer and more circuitous route by Great Round Shoal. Seventeen miles or more would have been thereby added to the distance to be run, but the peculiar dangers of the Slue would thereby have been avoided. Although the route through the Slue is adopted, by reason of its shortness, whenever possible, by vessels having to use one of the two routes, even by vessels drawing as much water as the barge, and is often safely used by such vessels, the navigation of the Slue channel by such vessels is well known to be attended with great dangers. Water of sufficient depth is at all times of the tide confined within scanty limits, so that great care in directing the vessel's course is always necessary in order to keep her within such limits. The shoals on either hand are shifting in character, so that the exact limits are not always the same. When this tug undertook to go through the Slue with these barges, it was about low water, so that the difficulty of finding water deep enough was at its maximum. There was also a good deal of sea running, and a current setting to the eastward. Besides the peculiar

dangers of the channel itself, the operation of getting the barges safely through it was attended with a further difficulty involved in the length of the tow as a whole. Between each two of its members was a hawser 180 fathoms long, so that the tug must have been very nearly half a mile ahead of the West Virginia, the last of the two vessels she was undertaking to direct. The only responsibility resting upon the barges was that of so steering as to keep in the wake of the tug; in all other respects the responsibility for their direction rested upon the tug. It is not only for the sake of vessels other than those she is towing that a tug which undertakes to navigate a fleet of this length is held to the extremest care; she owes the same degree of care toward the vessels in tow. The Gladiator, 79 Fed. 445, 25 C. C. A. 32. While there was little reason to apprehend difficulty in finding water enough for the tug or the Ivie, the West Virginia drew 20 feet 3 inches aft, and in the Slue could not safely be permitted to go anywhere except where the very deepest water was to be found.

All of the above risks and difficulties attending the attempt to take the barges through the Slue channel were clearly to have been anticipated by the tug, when she elected to make that attempt instead of adopting the Great Round Shoal route. She was bound to know them, and to use that degree of care and skill which was necessary in order to avoid them. Damage to a vessel while being towed does not under ordinary circumstances raise a presumption of fault on the tug's part; but under these circumstances, if the barge performed her duty of keeping in line and did not sheer, the fact that she grounded seems to me enough to raise a presumption that she was grounded by the tug's fault, as in Burr v. Knickerbocker, etc., Co., 132 Fed. 248, 65 C. C. A. 554; The W. G. Mason, 142 Fed. 913, 915, 74 C. C. A. 83. If she grounded in the narrow channel containing the deepest water, there was not water enough to justify the attempt to take her through the Slue. If she grounded outside that channel, it is for the tug to show why she was not kept within it.

On the tug's behalf it is claimed that the barge did not perform her duty of keeping in the tug's wake. It is alleged that, instead of doing so, she took "a sudden and rank sheer to port," parted her hawser, and thereafter drifted until she grounded. But it is not alleged nor admitted that the barge grounded outside the limits of the usual deep water channel; on the contrary, the allegation is that she took the ground about 800 or 900 feet to the southwestward of the gas buoy marking the broken part of Pollock Rip Slue, "at a point in the usual, customary, and well-known channel at that place for vessels of her size and draft" (Petition, art. 2), and the grounding is alleged to have been caused, if not by negligence on the barge's part, then by—

"some submerged wreckage or obstruction in the said channel theretofore unknown, or by some newly formed shoal or shallow spot theretofore unknown, and which could not in the exercise of due diligence have been known to those on board the said steam tug, and in a place where, up to that time, there had been, as shown by government charts and found by experience of mariners, 27 to 30 feet of water at low tide."

These allegations, contained in article 3 of the petition, are denied on behalf of the barge. The testimony of her master, on her forecastle deck at the time, and of the man at her wheel, is express and unqualified that she struck forward, and that the towing hawser, her headway being thus checked, came out of water, stretched, and parted. Both said that the barge was heading, when she struck, in the wake of the barge ahead, and that she made no sheer. The evidence that she did sheer comes from the master and chief engineer of the tug, nearly half a mile ahead, and from the captain and mate of the Ivie. Neither of these witnesses testifies to a sheer of more than three points, or to any sudden and rank sheer, nor was their evidence so given as to convince me that they certainly saw any sheer at all, made before the hawser had parted. No mention of any such sheer was made in the account of the accident entered in the tug's log, or in her master's reports of the accident, dated on the following day, and sent to the collector of customs and to the local inspectors at Boston. The master of the Ivie testified that before the hawser parted the West Virginia had come to be on a course further eastward than his own course, and, as he thought, dangerously near the easterly side of the channel, that he motioned to her to head further to the westward, and that she seemed to have done so when the hawser parted. This does not agree with the testimony of the master of the tug, who says the barges were in line, nor does it agree with the statement of the engineer of the tug, who says the barge sheered to the eastward. My conclusion on the evidence is that the barge grounded before parting her hawser, and that she was at the time substantially following in the wake of the tug and the Ivie. That she was, when she grounded, further to the eastward than the line which those vessels had been following, is not alleged in the petition; nor is it, as it seems to me, established by the evidence. After grounding, it does not seem impossible that she may have swung so as to be further to the eastward and thus nearer the buoys than when she struck.

I find, then, that the tug and barges were substantially in line when this barge grounded. I think the evidence further shows that they then had Pollock Rip Slue Lightship ahead, or nearly so, and had Pollock Rip Lightship astern, or nearly so. In other words, they were substantially on the line between the two lightships. On their starboard hand was the northwesterly end of what the charts call the "broken part" of Pollock Rip, and the gas buoy, bell buoy, and can buoy in close proximity to each other, which had been placed there to indicate the extremity of the shoal. The tug had passed the buoys referred to, and the Ivie had them abreast, or nearly so, so that the West Virginia had 180 fathoms, at most, to go before she would be herself abreast of them. According to the petition, the Ivie passed the buoys at a distance of 800 to 900 feet from them. At the trial the witnesses from on board the Ivie estimated this distance at 350 yards. The witnesses from the tug gave the same estimate as to their own distance from the buoys in passing them, and said the Ivie followed in their wake. Not much approach to accuracy can be expected from such estimates, but it is obvious that the allegations of the petition

were based on estimates not so favorable for the tug as those given at the trial. The nearer to the buoys referred to, the more danger there was of getting the West Virginia into water not deep enough for her safe passage.

[3] It appeared that on or about August 10, 1909, the Navy Department had called the attention of the Lighthouse Board in charge of the district to the fact that a shoal was making out to the westward of the three buoys, thus narrowing what had previously been the deep-water channel opposite them; also that, after an examination and report by the master of a lighthouse tender, sent to examine the locality, a horizontal striped spar buoy had been located 1,200 feet to the westward of the three buoys above referred to. This was done on September 20, 1909. On September 11, 1909, a "local notice to mariners" was issued by the inspector in charge of the district that the buoy referred to would be established about September 20th "to mark the westerly end of a shoal making out from Pollock Rip broken part nearly under bell buoy No. 1a, about 1,200 feet, with 21 feet of water on it at mean low water." The notice stated that "vessels drawing 21 feet should under no circumstances pass to the eastward of this buoy." This notice was mailed to the Chamber of Commerce Marine Department of Boston, various hydrographic offices, including the branch office at Boston, to various steamship companies in Boston, and to other institutions or persons outside of Boston. It was published in all the leading Boston papers.

The lighthouse inspector for the district was later notified that the buoy had disappeared on the morning of September 29th, the very day on which the grounding of this barge occurred. It was not replaced until October 2d. The three buoys above referred to have since been located where it was placed—i. e., 1,200 feet to the westward of their location on September 29th—and ever since this was done deep-draft vessels passing through the Slue have been accustomed to keep to the westward of them, in order to avoid the shallower water found to the eastward of them. But this cannot be done by following the direct line above referred to between the two lightships. Such a line passes considerably less than 1,200 feet from the old position of the buoys, and a course considerably more westerly must be followed in order to pass to the west of them in their new position.

Just how far to the westward of the buoys the West Virginia would have passed if she had kept on as she was being towed when she grounded, cannot be found from the evidence, which consists only of estimates made at the time, without opportunity for measurements. I think it was certainly less than 350 yards (1,050 feet), and very likely considerably less. There is no question whatever that it was less than 1,200 feet, and she therefore grounded within the area of the new shoal as indicated by the Lighthouse Board's buoy. This conclusion is established independently of the evidence that after she grounded part of a spar buoy was seen anchored at some distance on her port hand. It was described as broken at the top and projecting only a short distance above the water. It had not been seen from the tug or from the Ivie before the grounding. This may very probably

have been the Lighthouse Board's buoy, broken, but not carried away. Yet, of course, there is nothing to show that it had not been moved at all from its original place. Without drawing any inference from the evidence as to its position at the time of the barge's grounding, I think the evidence regarding the new shoal, its location and extent, and the depths of water later found within it, on or near the direct line between the lightships, when it was subsequently sounded and charted, sufficiently shows that the barge was, as a matter of fact, being taken where the risk was great of finding water not deep enough for her, either forward or aft, in the then state of the tide. This is enough, in the absence of direct evidence to support it, to prevent the conclusion that she must have grounded on a sunken wreck, and enough, in view of the burden resting on the tug, to require the conclusion that she grounded because she was not kept in the deepest water available for her, which was at the time to be found more than 1,200 feet away from the buoys, and considerably to the west of the direct line between the lightships. Neither the tug nor the Ivie was drawing more than 16½ feet, so that no danger of grounding either of them was to be apprehended. The fact, however, that the West Virginia needed nearly 4 feet more depth than either of them was not sufficiently allowed for. Whether she grounded forward or aft, at first, I do not think is clearly shown by the evidence, nor do I consider it important to determine.

The master of the tug was entirely ignorant regarding the altered conditions in the channel recently created by the new shoal, and of the fact that a new buoy was to be placed or had been placed to mark its extremity. There had been nothing in his previous experience to warn him that a vessel of the barge's draft could not be safely towed past the three buoys at low water on the line between the two lightships. Neither on the charts nor in the books of sailing directions in common use, and published prior to the location of the new buoy, was anything to be found to indicate that such were the facts. I think the evidence shows that, before the new shoal had rendered it dangerous, a vessel of the barge's draft could safely have been towed where he was towing this barge at the time she grounded, under the like conditions, and that the danger incurred by him was of recent origin.

But I am unable to regard his ignorance of the facts as they existed at the time the barge grounded as an exoneration of the tug from the charge of negligence. It was long ago held in this court that a tug is bound, as regards her tow, to know the nature of the bottom, as well as the depth of the water, and this whether in their natural state or as changed by permanent excavations. The Effie J. Simmons (D. C.) 6 Fed. 639; The Henry Chapel (D. C.) 10 Fed. 777. In a locality more than usually dangerous, as this was, the tug is held to a proportionately higher degree of care and skill. The Somers N. Smith (D. C.) 120 Fed. 569. Ignorance of the dangers of such a place is, therefore, to be less readily accepted as excusing what would be negligence if there had been knowledge. The question must be whether due use of all available means of knowledge has been shown on the part of the tug.

The lighthouse inspector's notice of September 11, 1909, published as above, was the first public notice given of the proposed location of the new buoy or of the existence of a shoal between it and the three buoys; but it was not the first public notice calculated to warn navigators of probable danger within the area to which it referred. The Hydrographic Office at Washington issues a weekly printed bulletin under the authority of the Navy Department, which sets forth, as they are obtained, items of recent information important to navigators like those below stated. In the issue of May 15, 1909, there had appeared, under the head of "Obstruction Reported in Pollock Rip Slue," two reports of vessels which had touched bottom off the three buoys on the line between the lightships. One vessel was stated to have been drawing 20 feet 6 inches; the other, 17 feet 4 inches. These bulletins are kept on file in the branch Hydrographic Offices, one of them being at Boston, another at Norfolk, Va., and this bulletin had been there accessible, with others, since May, 1909. The bulletins are also mailed from Washington to all persons who request it. Neither the master of this tug nor her owner at Boston was on its mailing list. The bulletins are also regularly sent to and kept on file at the Chamber of Commerce in Boston.

Nor was the notice of September 11, 1909, the last notice published before September 29, 1909, of probable danger to be encountered at the place of this accident. On September 17, 1909, this notice was repeated in a bulletin that day published at Washington by the Lighthouse Board and Coast Survey, similar to the bulletins sent out by the Hydrographic Office. And the New York Herald, a paper widely circulated among persons interested in vessels, and one which they are accustomed to consult as containing such items of recent information, contained in its issue of the same day a report that the United States steamship Birmingham had grazed the bottom 150 yards southwest of the bell buoy above referred to, while drawing 18 feet 8 inches. The Hydrographic Office bulletin issued at Washington September 18, 1909, repeated the lighthouse inspector's notice of September 11th regarding the proposed location of the new buoy, and the Hydrographic Office bulletin of September 22, 1909, contained the Birmingham's report above mentioned and another report that the United States steamship Salem had stirred up mud while passing the three buoys on a line between the lightships, drawing 18 feet 1 inch.

The publication and circulation of the above notices, official or otherwise, regarding danger to be apprehended in this part of the Slue channel by vessels drawing as much water as this barge, seems to me at least enough to indicate that knowledge sufficient to put a navigator on his guard must have become somewhat widely diffused before September 29, 1909, among navigators having occasion to use this channel. And there was evidence, of which no serious contradiction was attempted, that at least since about midsummer of the same year, and very probably for a considerably longer time, it had in fact become known among such navigators that the channel was shoaling up by reason of a shoal making out into it westward from the three buoys. If other navigators had this knowledge, this tug can

hardly be said to have exonerated herself from the charge of negligence, to which, under the circumstances, she is presumptively liable. Her master failed to keep as far away from possible danger as he might have kept, and, instead of doing so, took the barge into a part of the channel where there was danger, when, as a matter of fact, there was another part of it, not far off, in which he might have kept clear of danger altogether. Due care toward the barge on the tug's part required his information regarding this part of the channel to be at least as complete and accurate as any information then current among navigators using it, and he cannot be heard to say that he did not possess it.

It is true that, according to the evidence, he had had 14 years' experience as master of a tugboat, and had held a first-class license as pilot for 3 years; but his ignorance of any shoaling in this part of the channel he admits himself. It appeared that he had commanded this tug since September 1, 1909; that he left Boston with her for Norfolk September 9th, and arrived at Norfolk, where he resides, on September 14th; that he visited the branch Hydrographic Office there on September 16th, asked for the recent bulletins, and took what they gave him. It does not appear what bulletins he got, but he testified that they contained nothing relating to Pollock Rip Slue. He left Norfolk in the tug for Boston with the two barges on September 17th. On September 26th he arrived with them in Vineyard Haven, and remained with them there, on account of bad weather, until the morning of September 29th. At Vineyard Haven he was on shore a part of the time and talked with other masters of tugs, but, he says, learned nothing of any changes in the Slue. If he was engaged in this manner between September 9th and 29th, he may well have missed seeing some or all of the published notices above mentioned, and it may be impossible to say that on any particular occasion he was guilty of neglect for failing to find a given notice. But I am unable to believe that this is enough to excuse him for not possessing knowledge adequate to the occasion under the circumstances. Having chosen the more dangerous, instead of the safer, route, if there was knowledge, current among navigators to the extent above stated, which would have enabled him to avoid this shoal, I think he was bound at his peril to have and use it. No special effort on his part to revise his knowledge of the Slue channel is shown, either for the purposes of this or of any recent voyage. Ignorance of recently changed conditions in a harbor, where similar means of knowledge exist, may properly be regarded as in itself negligence on the part of the master of a vessel, as was held in Davidson S. S. Co. v. U. S., 205 U. S. 187, 27 Sup. Ct. 480, 51 L. Ed. 764.

For the above reasons I think the evidence requires me to hold that the barge grounded because of a failure on the tug's part to use that degree of care and skill called for by the towage contract under the circumstances. It is urged that the barge appears to have been so lightly aground at first that with a hawser of proper strength she would have been towed over the spot whereon she grounded without

stopping, that the barge's hawser parted because it was old and weak, and that the result of its parting was to leave the barge aground long enough to become more firmly aground, so that her subsequent leaking and loss cannot be ascribed to her original grounding. The hawser which parted belonged to the barge; it had seen a good deal of use, had parted before, and had been spliced. The barge had a new hawser on board, which might have been used. I am not satisfied, however, that the hawser (part of which was produced at the trial) was insufficient for such emergencies as the barge was called on to anticipate, nor that any hawser, new or old, would have resisted the strain of her grounding so as to tow her over the obstruction.

[4] 3. Does the evidence charge the petitioner, as owner of the tug, with privity or knowledge in respect of the negligence thus ascribed to the tug?

It is urged on behalf of the damage claimants that the master of the tug was incompetent. He was 49 years old, and had had 30 years' experience at sea, during 14 of which he had commanded tugboats. So far as appears, he had the full use of all his faculties, and there was nothing to his discredit in his record. That he is now shown not to have possessed the knowledge which might have enabled him to avoid the particular danger which injured the barge does not seem to me enough to make him incompetent in the sense in which the term must be used if the petitioner is to be charged with privity and knowledge because it was employing him. The petitioner's managing officers are not shown to have been aware of any want of knowledge on his part, nor do I think it can fairly be said that they ought to have been aware of it. To keep himself familiar with all the dangers of navigation attending the voyages he had to make was part of what they employed him to do. I am unable to believe that they were chargeable with the duty of seeing to it, prior to each voyage, that he had used all available sources of information regarding such dangers. To say that they failed to furnish a properly equipped tug, because they did not see to it that the master was furnished with all official notices regarding the Slue as soon as published, would be to set up a standard of proper equipment so much more exacting than any heretofore required as to be, in my opinion, unjustifiable. They had issued certain standing regulations for the guidance of the masters of their tugs, and these are claimed to have been defective, in that they required "no time to be lost on passage or in harbor, as it is absolutely necessary that quick time be obtained," while they did not include directions specifying the precautions to be taken. But this is no more than saying that they left the conduct of the voyages to the judgment of the captains; and they had the right to do so, if the captains were generally competent. I am unable to hold that they are chargeable with privity or knowledge on the facts shown.

There will be an interlocutory decree holding the petitioner liable to the damage claimants in the amounts of their respective claims, to be assessed; and the petitioner will, in the final decree, be allowed the limitation of its liability which it seeks.